THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LARRY MARTIN, Defendant-Appellant.

Third District   No. 77-516

Opinion filed February 20, 1980.

Robert Agostinelli and Michael Filipovic, both of State Appellate Defender's Office, of Ottawa, for appellant.

L. Patrick Power, State's Attorney, of Kankakee (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

This is an appeal by the defendant, Larry Martin, following his conviction for kidnapping. Having pleaded guilty, the defendant was sentenced to a term of imprisonment of not less than two nor more than 15 years. In this appeal, however, the defendant challenges that sentence as being excessive, arguing that there exists no justification for the disparity between the defendant's sentence and the sentence of not less than one year nor more than one year and one day imposed upon a co-defendant.

The co-defendant, Maurice Jones, was tried first and found guilty of both kidnapping and unlawful restraint after a jury trial. At the sentencing hearing, he presented three character witnesses: Martin Downs, Richard Rowman and Goldie Brown. All of these witnesses were employed at the Manteno Mental Health Center. Downs testified that he had over 150 contacts with Maurice Jones while he was at the Center and was of the opinion that Jones was a "nice guy" and had not been a problem patient. Downs qualified his testimony by stating that Jones was not a model patient.

Rowman testified that a week or two prior to this offense, Jones had developed an attitude of internal anger and hostility. He seemed to be

having problems with authority figures. Jones informed the witness that he was afraid of being sent to Chester Mental Health Center.

The trial judge then questioned Rowman with respect to the defendant, who was not present at Jones' sentencing hearing. The following exchange occurred between the Court and the witness:

"THE COURT: The most active participant in this whole thing was one Larry Martin. Are you acquainted with him?

A. Yes, possibly better than with Mr. Jones because he was there longer and I had more contact with him.

THE COURT: Based upon what I have heard at the trial and the testimony I intended to come to the conclusion that this whole thing probably would not have happened if it wasn't that Larry Martin wasn't there to act as the catalyst and to lead the thing through this. Do you have any opinion along those lines?

A. Strictly as an opinion I saw Martin as having more to lose by his act than Mr. Jones.

THE COURT: More to lose or more to gain?

A. No, more to lose because my knowledge at that particular point they had been considering him for release to a drug abuse program at Tinley Park so that in essence he—

THE COURT: What was Martin awaiting trial for at the time?

A. He had a drug abuse charge and I think at that point they were executing a deal for him to—charged to be dropped if he would go into a drug abuse program at Tinley Park I think he was aware of that. In any event I was aware of it and it seemed to me that he had a lot to lose running off at that point. The deal would be thrown out, I would assume."

Goldie Brown also testified on behalf of Jones. She stated that he had at one time come to her aid when another patient had attempted to attack her with a fork.

In addition to this testimony, the court was presented with a presentence investigation report which revealed that Jones was 24 years old at the time of sentencing. His prior record included a finding of delinquency for retail theft and a conviction for armed robbery, for which he received a sentence of not less than four nor more than four years and one day. The report further disclosed that Jones had mental problems stemming from a nervous breakdown he suffered while awaiting trial on the armed robbery charge.

Although the State recommended that Jones be sentenced to a term of not less than three nor more than 12 years, this recommendation was not accepted. In issuing sentence, the trial judge stated:

"* * * It is true he was convicted by a jury of kidnapping. The intent that he formed for the necessary kidnapping must have

certainly been one of the barest minimum of intent, the jury did find it apparently. He was also convicted of unlawful restraint.

\* \* \*

\* \* \* Now I do not—it would be hard for me to imagine a kidnapping wherein the danger to the victim from Mr. Jones could have been any more minimized. I don't think that there was any serious situation where this person was going to be harmed. True, they did carry a person to another place and confine a person apparently secretly and meet the requirement of a kidnapping. Probably the most outstanding intent was not so much the kidnapping as to get away from Manteno State Hospital. That may have been implemented by the Assistant Superintendent when he indicated to them that they were going to be sent down to Chester.

\* \* \*

Now, a point is made of the prior conviction for armed robbery for which apparently the Defendant has paid his price to society. And I don't know what the facts of that armed robbery was [sic] but apparently the Judge who sentenced him found at that time a minimum amount of criminality in his conduct because he gave him a minimum sentence of four years minimum and four years and a day maximum.

\* \* \*

Basically there have been some fairly nice things said about him by some of the gentlemen from the Department of Mental Health. Apparently he saved one person from a degree of bodily harm from a patient there when that patient attacked the lady. I think all of these things should be taken into consideration. I am not too sure that the Defendant does not meet the requirements for probation. I don't know as though it is necessary any more for his imprisonment to protect the public. I really don't know if he is in need of correctional treatment that can most effectively be provided by a sentence of imprisonment. Perhaps the biggest problem with this case in my mind is that a condition of—a sentence of probation or conditional discharge would deprecate the seriousness of his conduct and would therefore be inconsistent with the ends of justice."

Subsequently, pursuant to a plea agreement with the State, the defendant pleaded guilty to the offense of kidnapping. In return for defendant's plea of guilty, the State agreed to dismiss the charge of unlawful restraint and to recommend a period of imprisonment of not less than three nor more than nine years. The State agreed to allow the defendant the option of recommending a lesser sentence.

Presiding at the defendant's sentencing hearing was the same judge

that sentenced Jones. A presentence report revealed that the defendant was 24 years old at the time of sentencing and, as a juvenile, had committed three burglaries.

In addition, the report pointed out that on January 14, 1975, the defendant was committed to the Department of Mental Health after being found unfit to stand trial in Cook County on unrelated charges of burglary and aggravated battery. After the defendant was subsequently found fit to stand trial, he pleaded guilty to both charges.

In defendant's statement to the presentence investigator, he indicated that the aggravated battery incident occurred because the complainant, a former boyfriend of the defendant's sister, had been beating up his sister and threatening to kill her. The presentence report further revealed defendant's past drug problems with heroin and morphine, and his past mental health problems.

At the sentencing hearing, the State presented three witnesses. The testimony of these witnesses established that on February 9, 1976, the defendant Larry Martin and co-defendant Maurice Jones were residents of the Manteno Health Center. On that date, at about 2 a.m., a Mr. John Gleason and Mrs. Margaret Lampley were sitting in a break room at the Manteno Mental Health Center having coffee. At the same time, Mrs. Florence Words was sitting at her desk which was located a few feet outside of the break room. Gleason, Lampley and Words were all employees of the Department of Mental Health. The defendant approached Words while she was sitting at her desk. He held a finger over his mouth and a knife in his hand, and he told Words to keep quiet. The knife he was holding was variously described as a razor used in opening cartons, by Gleason, and as a knife with a two- to three-inch blade, by Words. At that very moment, Gleason and Lampley hearing a noise, looked out of the glass partition in the break room and observed the defendant standing over Words. Gleason went out to investigate, but as he stepped out of the door, Jones came up from behind and put an iron bar to his throat. Jones told Gleason to come peacefully, that they did not want to hurt them. Jones then herded Gleason and Lampley past Words. After they passed, the defendant told Words to get up, and they all proceeded to the men's washroom.

While walking, Jones held Gleason and Martin held Mrs. Words. Jones and Martin said they were going to tie up Words and Gleason, and Martin stated that they were going to take Lampley with them. Gleason and Words were then tied up in the men's washroom, and the defendant, Jones and Lampley left the washroom and started walking towards the north dormitory.

When Lampley asked for her coat and wallet, the defendant went with her to retrieve these items. Jones was not present at that time, having

gone into the dormitory somewhere. The defendant then picked up his belongings which were already assembled.

After picking up her belongings, Lampley heard loud talking. Gleason had apparently untied himself. Jones went back into the washroom with the pipe in his hand and retied Gleason and Words together. When Jones came out of the bathroom, the defendant told Jones to lock the door.

Lampley, Martin and Jones then proceeded to Lampley's car. The defendant told Lampley to unlock the lock. After she complied, she sat on the passenger's side, the defendant drove, and Jones was in the back seat. So situated, they started towards the main gate.

A security car was blocking the road. The defendant swerved around it, and Jones told him to turn left. The defendant acted as though he did not know how to get out of the hospital, but Jones did know and told Martin to turn left. As they approached the main gate, Jones told Lampley that if anybody was at the gate "tell them that you had to go home for some reason or another." They then drove out onto Bernard Road. After they got onto Bernard Road, the defendant lost control of the car and drove into a ditch. Lampley jumped out of the car and into a security vehicle which had been following them. The defendant and Jones were both apprehended.

The defendant testified that Jones had informed him that he, Martin, was going to be transferred to the Chester Mental Health Center, and that he should leave before the next day. At about 12 o'clock on the night of the occurrence, Jones approached the defendant and told him to get ready if he was going to go with him. The defendant testified that, prior to that time, he had not made plans to leave and that he never intended to hurt anyone. On cross-examination, the defendant stated that prior to breaking out of Manteno Mental Health Center he was aware that he was to be transferred back to the Cook County Jail for a hearing.

Following the presentation of this testimony, the State recommended that the defendant be sentenced to a term of not less than three nor more than nine years' imprisonment. In support of their recommendation, the State argued that defendant had used a deadly weapon. The following exchange then occurred between the prosecutor and the court:

"THE COURT: I don't know whether the weapon was deadly or not. I don't know what kind of a knife this is. I got a vision right now of something that may have had a little blade, quarter of an inch sticking out that is used to cut up boxes. I don't know how deadly that would be.

MR. SCHMIDT: Applied to a throat it could be very deadly, applied to any—

THE COURT: Under the circumstances I suppose anything

would be a deadly weapon if you worked long enough with it. You haven't established what really this thing was that was in his hand.

MR. SCHMIDT: Well, be that as it may we have had testimony that the handle of the knife is about three inches long and that there was a blade an inch to a quarter of an inch in length, it was described as being comparable to a razor blade, very sharp edge.

THE COURT: Well, you described it that way through your leading questions.

MR. SCHMIDT: No objection, it was adopted by the witness.

THE COURT: I will decide for myself how much credibility I will apply or how much weight I will give to it. Now, if the witness says one thing without somebody leading him, I intend to give him a little more credibility than if the State's Attorney is going to testify without showing what he's testifying from and what his knowledge of it was because you didn't establish—bring me a weapon in Court then the credibility tends to go down a little bit."

In opposition to the State's position, the defendant recommended a sentence of from one year to one year and one day. After taking the matter under advisement, the court sentenced defendant to a term of imprisonment of not less than two nor more than 15 years. In sentencing the defendant, the court relied primarily upon the defendant's prior criminal record.

Thereafter, the defendant filed a motion to withdraw his guilty plea and to vacate the judgment, or in the alternative, for a reduction of sentence. At a hearing on this motion, the State moved to strike that portion of the motion which dealt with the withdrawal of the plea of guilty. The State's motion was granted and the cause was called only on the motion for a reduction of sentence. The argument presented by the defense at this hearing was that there were insufficient differences in the backgrounds of the defendant and co-defendant Maurice Jones to justify the great disparity in their sentences. The defendant requested a reduction of his sentence to the sentence received by his co-defendant.

In denying defendant's motion, the court stated:

"At the time that these sentences were imposed in regards to the co-defendant, Maurice Jones, the Court took into consideration the presentence record, the evidence that was presented at the sentencing hearing as well as the evidence that was presented during the course of his trial all of which tended to indicate to this Court at that time—I see no evidence to the contrary that Maurice Jones' part in this thing was more of a passive than an active one.

I also took into consideration his background, his demeanor in Court and everything else that was presented. While it is true I

have not had the benefit of as much information concerning Mr. Martin because there was no trial, there was a plea, I still have the presentence investigation report which shows a great deal of information concerning him and what was presented at the sentencing hearing.

It would appear, also, that Mr. Martin—still would appear to the Court that Mr. Martin was the more active force involved and he was the one who was armed with a more dangerous weapon. During the course of this whole thing I haven't been presented with anything else so there is nothing else for me to consider so without anything else to consider at this time the motion is denied."

■■ When determining whether a sentence is excessive in light of a lesser sentence imposed on a co-defendant, consideration is to be given to the differences in criminal background and the degree of participation by each defendant in the commission of the offense. (*People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167; *People v. Steg* (1966), 69 Ill. App. 2d 188, 215 N.E.2d 854.) A disparate sentence may be supported by either a more serious criminal record (*People v. Henne* (1973), 10 Ill. App. 3d 179, 293 N.E.2d 172) or greater participation in the offense (*People v. Hodges* (1979), 69 Ill. App. 3d 113, 387 N.E.2d 29). Otherwise, defendants similarly situated ought to receive similar treatment in sentencing, as is required by fundamental fairness. *People v. Henne* (1973), 10 Ill. App. 3d 179, 293 N.E.2d 172.

■■ Comparing the defendant's prior criminal record with that of Jones, we find that Jones had a juvenile conviction for retail theft and an armed robbery conviction as an adult. The defendant has a juvenile record which consists of convictions for three burglaries. As an adult, the defendant was convicted of burglary and aggravated battery as a result of two unrelated incidents. Certainly, the defendant's more serious record warrants a somewhat greater sentence.

As for the relative participation in the commission of the offense, the trial court found that the defendant took a more active part. The defendant argues that the facts do not support the conclusion that the defendant's participation was greater than that of his co-defendant.

In evaluating the evidence, it must be recognized that a reviewing court's power to reduce a sentence is to be exercised with great caution because the trial court is in a better position to evaluate the circumstances and to impose the appropriate sentence. (*People v. Sherman* (1977), 52 Ill. App. 3d 857, 368 N.E.2d 205.) There are a number of facts from which the trial court could conclude that the defendant was the instigator of or leader in the commission of the instant offense. The evidence presented at the sentencing hearing established that the defendant gave the orders, with the isolated exception of Jones informing the defendant of the way

out of the parking lot. By that time, however, the offense had been fully completed. In addition, it was the defendant who announced that Lampley would be required to accompany Jones and the defendant as a hostage to assist in their release. .

■■ Based on these facts, one of the victims, Gleason, testified to his belief that the defendant was "calling the shots." Add to this the fact that the defendant drove the automobile, and the court is certainly warranted in reaching the same conclusion, that the defendant was the leader. And a greater sentence may be imposed upon a defendant who has been determined to be a leader or instigator in the commission of an offense. *People v. Housby* (1975), 26 Ill. App. 3d 92, 324 N.E.2d 465.

No abuse of discretion can be attributed to the trial judge for imposing the instant sentence. Accordingly, the judgment of the Circuit Court of Kankakee County is affirmed.

Affirmed.

STOUDER, P. J., and SCOTT, J., concur.