THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
PHILLIP KLINE, Defendant-Appellant.

Third District    No. 79-536

Opinion filed August 25, 1981.

Shelvin Singer, of Chicago, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

In 1979, after a bench trial, Phillip Kline was convicted of the 1973 bludgeon murder of Bridgette Regli in a country field in Will County. Kline was sentenced to a term of from 50 to 100 years imprisonment for the killing. From his conviction and sentence he now appeals. Numerous issues are raised by the defense on appeal, including issues on the sufficiency of the evidence for conviction, the propriety of several evidentiary rulings, the failure to provide Kline with a judicial probable cause hearing, and alleged prosecutorial improprieties before the grand jury. The final issue raised concerns the length of the sentence imposed by the court. We shall set forth the issues with more particularity as we address them in the body of the opinion.

The record reveals that 17-year-old Bridgette Regli was bludgeoned to death on December 6, 1973, in a Will County field. The State's evidence established that Miss Regli was a student at Crete-Monee High School in 1973. On December 6 of that year she finished her last class of the day

shortly before 1 p.m., and, as was her custom, she then started her walk home. She was the school photographer and usually carried a camera with her. As she walked along the street south of the high school she was observed by a junior high student. Valinda Avey, a junior high school student who knew Bridgette Regli, testified that at about 1 p.m. on December 6, 1973, she was gazing out of a school window, while acting as an office aide. She testified that she saw Miss Regli walking down the street. She was carrying books and another bulky object which Miss Avey could not identify. Miss Avey stated that she noticed a car stop just past where Miss Regli was walking and that a person of high school age got out of the passenger side of the auto. Miss Regli then entered the car and it was driven off in a southerly direction. Miss Avey described the car as being two-door, tan or cream colored and with a dark interior. She stated that she did not recall if the car was two-tone. She testified that the size and make of the car was similar to that of a Mustang. She described the person who got out of the car as a young male, high school age, having dark, shoulder length hair and of average height. She testified that the male was of dark complexion, of Mexican or Latin race.

Two days later the battered body of Bridgette Regli was found in a field in Will County by a hunter. Pathological evidence indicated that the killing took place four to six hours after Miss Regli's last meal, which, according to her father, was breakfast on December 6, 1973. The pathologist testified at length at the trial. He testified that the decedent had significant wounds on the forehead and on the left rear of the head, as well as more superficial wounds on the forehead. She also had numerous bruises, cuts and abrasions on her body which indicated a considerable struggle prior to death. Concerning the penetrating wound to the right front area of the skull, the pathologist stated that it was ovoid in shape, and could have been caused by the shaft of a golf club or other similar instrument. The blow pierced the skin and went to the bone. It was the opinion of the pathologist that this blow to the forehead was not the fatal blow. The fatal blow was one to the left rear of the head, which was administered by a tree limb or similar object. The pathologist also stated that there were present, on the victim, scratches and discoloration in the neck area. He testified that the wounds to the neck were consistent with a forceful grasping of the neck, although he indicated that the victim did not die by strangulation.

The other evidence for the State, and the central focus of the contentions on this appeal, was the testimony of Anna Kline, the estranged wife of defendant Phillip Kline. Anna Kline testified that she became acquainted with Phillip Kline in September of 1973. At that time, Phillip was a high school student and Anna was a 24-year-old married woman. Later, she and Phillip lived together at various different times. They were

married in February 1976. She testified that Phillip was an excellent golfer and a wrestler for the high school. She also testified that Phillip Kline was a narcotics user and peddler. She admitted the same about herself as well. Anna Kline then testified to some conversations that she had with Phillip Kline in 1975, at a time when they were seeing each other, but prior to their marriage. According to Anna Kline's testimony, in November 1975, Phillip Kline told her that he was present at the murder of Bridgette Regli but he denied touching her at all. He indicated to Anna that Miss Regli had taken a picture of a drug transaction. He stated that he and Arthur Garza were present. Anna Kline testified that Phillip told her that he grabbed the camera from Miss Regli, tried to destroy the film, and then put the camera in the trunk of his Mustang. He also told Anna that Arthur Garza had killed Miss Regli with a golf club. In a different conversation, Phillip Kline told Anna that when he took the camera from Miss Regli he felt like choking her, but he did not.

In addition to her testimony about the 1975 admissions, Anna Kline also testified as to specific occurrences on the day of the killing. This was December 6, 1973, and prior to the time she and Phillip had become intimate. She testified that on that date, around 5:30 p.m., she saw Phillip Kline and Arthur Garza at her apartment. She testified that Kline and Garza were selling records to raise money for a trip to Florida that night. She testified that Garza was about 5'11" tall, slender, with dark shoulder length hair and an olive complexion. She also testified that Phillip Kline that day was driving a 1970 tan or cream-colored Mustang with a brown scroll top. Anna Kline testified that she still loved Phillip Kline.

The defense cross-examination of Anna Kline established that she was a narcotics user and had on occasion sold narcotics. She admitted to having taken valium, about 30 milligrams per day, in December 1978, the time when she first informed the police of Phillip Kline's incriminating statements made to her in 1975. Also established was that for the 10 months prior to October 1978, while separated from Phillip Kline, Anna Kline resided with Mark Pascarella. Pascarella moved out after a dispute with Anna Kline and shortly thereafter she contacted the sheriff's department to accuse him of sexually molesting her daughter. No charges were filed.

In addition to its efforts in cross-examination, the defense called numerous witnesses in an attempt to discredit Anna Kline and her testimony. An investigator for the public defender's office testified that Anna Kline told her that Phillip Kline had denied involvement in the Regli killing. The investigator also testified that Anna told her that she was threatened by a court deputy with criminal proceedings and loss of custody of her children, if she did not cooperate with the police. She admitted to the investigator that she had sought to get money from

Phillip's parents but had been unsuccessful. The defense produced Anna Kline's sister, Rhonda Shambo, who stated that Anna told her that she was not going to testify against Phillip and that she was on narcotics when she told the police of the statements. When asked why she had started the trouble in the first place, Anna Kline told her sister, "for revenge." Two persons testified to hearing Anna Kline tell a sister of Phillip Kline that she would get revenge on Phillip for running off to California with a Sherry Mason. Mark Pascarella, with whom Anna Kline had lived for a 10-month period, testified that Anna used a lot of valium while they were together. He also testified that after an argument over rent she ordered him out of the house. He left, and about a month later was contacted by the sheriff's department in connection with allegations made by Anna that he had molested her daughter. No charges were brought from the allegations. Marlena Wooten, Anna Kline's sister-in-law (married to Anna's brother), also testified for the defense. She testified that Anna was angry because she was not going to get any money from the Klines. She stated, too, that Anna told her that her daughter had not been attacked and that she had accused Pascarella because he would not pay the rent.

Further testimony concerning Anna Kline's bias and prejudice against Phillip Kline came from his parents, who indicated that Anna had constantly requested money from them, which they supplied at first, but later stopped. Anna threatened them, telling them she would get even with them and have her revenge on Phillip. She told them she would see him "rot in jail." This conversation was confirmed by an employee of the Klines who was listening in on the conversation on another extension.

In addition to the defense witnesses called to discredit Anna Kline's testimony, two alibi witnesses took the stand for the defense. James Roberts and Bernice Clark, classmates and friends of Phillip Kline, as well as drug purchasers from him, testified that they were with Phillip on December 6, 1973, in the afternoon. Clark testified that she was with him until 1:30 p.m. and that Arthur Garza was not with them. Roberts testified that he was with Kline until 3 or 3:30 p.m. on the 6th of December. Rebuttal testimony by police officers who had previously interrogated both Roberts and Clark indicated that both had given prior inconsistent statements about the occurrences of December 6.

Phillip Kline also took the stand in his own behalf. He denied seeing the decedent on December 6 and denied any part in or knowledge of the murder. He stated that he was with some other truants on that day and that they rode around in his car during the afternoon. He admitted to smoking a marijuana cigarette in the high school parking lot and passing it to Roberts. He denied participating in any drug transactions on December 6, 1973. He testified that he had planned to go to Florida because of problems with his parents. The State's evidence indicated that Kline left

for Florida with Arthur Garza on the night of December 6, 1973. They drove Kline's Mustang, and he carried his golf clubs with him in the trunk. Kline testified that he was a "scratch" golfer and hoped to earn money with golfing in Florida. He testified that he first learned of the killing of Miss Regli when he called his home on December 14, 1973. At that time he learned that he and Garza had been named in warrants in connection with the murder. He stated that he and Garza began hitchhiking home to clear themselves. Kline denied ever telling Anna Kline that he was present at decedent's killing. Phillip Kline's testimony as to his movements and whereabouts on December 6, 1973, was impeached through the introduction of several prior inconsistent statements he had given to the police.

The trial judge, sitting also as the trier of fact, found the defendant guilty of murder. A sentence of 50 to 100 years was imposed, to run concurrently with sentences received in connection with two Cook County murder convictions.

The first issue raised by the defense is whether the defendant was proven guilty beyond a reasonable doubt. It is argued that the State's case was insufficient to establish guilt because it was based primarily upon the testimony of Anna Kline. The defense argues that her testimony must be found to be incredible because she came forward with Phillip's admissions years after they had allegedly been made, because she came forward only after Phillip had left her for another woman, and because her testimony as to Phillip Kline's incriminating admissions was contradicted by the physical evidence. The essence of the defense position is that Anna Kline fabricated the alleged admissions in order to have her revenge upon Phillip Kline and his parents.

This is a case of conflicting evidence wherein credibility assessments are of great importance. As the Illinois Supreme Court stated in *People v. Ellis* (1978), 74 Ill. 2d 489, 496, 384 N.E.2d 331:

> "Where there is conflicting testimony, as here, regarding five separate incidents in the polling place, the appeals court must not substitute its judgment, because the weight of the evidence and credibility of witnesses are strictly within the competence of the fact finder. [Citations.] Only where the evidence fails to sustain the verdict, or is improbable, unsatisfactory or inconclusive, may we set aside a conviction; and there it is our duty to do so. [Citations.]"

This court made similar observations in the case of *People v. Hunt* (1979), 75 Ill. App. 3d 1023, 1026, 394 N.E.2d 759, wherein we stated:

> "It is the trial judge, not the reviewing court, who has the opportunity of observing the attitude and demeanor of the witnesses. In such a case where there is obviously bias and prejudice on the part of the witnesses, a reviewing court should be ever so reluctant to disturb the decision of the trial court."

There is no doubt that there was evidence presented to the court which, if believed, was sufficient to prove Phillip Kline guilty of murder beyond a reasonable doubt. There was the testimony of his admissions about participation in the killing, and there was circumstantial evidence about the crime which was consistent with those admissions. It is obvious that in reaching its decision to convict, the court found credible Anna Kline's testimony about Phillip Kline's incriminating admissions. The principal basis for that finding was the correspondence between the circumstantial evidence and the substance of the admissions. The defense, in raising the reasonable doubt issue, is in reality attacking the trial court's finding that Anna Kline's testimony was credible.

■■ Her testimony was that in November 1975, she asked Phillip Kline about the killing of Bridgette Regli. She testified that she and Phillip were engaged at the time, and before she married him she wanted to know about it. The basis for her question, she stated, was the presence of rumors she had heard about the killing and Kline's involvement with it. According to her testimony, Phillip Kline told her that he had been with Arthur Garza when Garza killed Miss Regli by hitting her with a golf club. He told her that the killing was the result of a photograph Miss Regli had taken of a drug transaction. Kline indicated that he took a camera away from Regli and put it in the trunk of his car. He said he felt like choking her but that he did not. He also told her that he had not laid a hand on Bridgette Regli. As the trial court noted, the specifics about the killing contained in the admissions to Anna Kline were largely corroborated by the other evidence about the slaying. There was the pathologist's testimony that the wound to Miss Regli's forehead was consistent with a blow from a golf club. Kline admitted that a golf club was used in the attack. There were Kline's admissions that Arthur Garza was involved in the killing and that his automobile was involved. Valinda Avey testified as to the description of the auto used, saying it was cream or tan colored and similar to a Mustang. That description substantially fit Phillip Kline's auto. Miss Avey testified about the physical characteristics of a young man who got out of the auto to let Bridgette Regli into the auto. Her description of that man fit Arthur Garza, who was also put in Kline's company by other testimony. Kline stated that the motive behind the slaying was Bridgette Regli's photograph of a drug transaction. There is evidence in the record that illicit drug activity did take place on December 6, 1973. The defendant admitted that he rolled and smoked a marijuana cigarette in the school parking lot on the morning of December 6. He admitted to perhaps passing it to Jim Roberts for a couple of drags. It was established that Bridgette Regli usually carried a camera with her and that she was the school photographer. Miss Avey testified that she had a bulky object with her as she walked down the street. This independent circumstantial

evidence about the murder, all consistent with specifics of Phillip Kline's admissions, give added credence to Anna Kline's testimony about those admissions. Noting the corroborative effect of the circumstantial evidence upon her testimony, the trial court found that Anna Kline was telling the truth when she testified to the statements by Phillip Kline about the killing of Bridgette Regli. We find the evidence supportive of that determination, and, therefore, find no basis to reverse the finding of the trial court on the crucial question of credibility.

The defense responds with argument that the other evidence is not consistent with the admissions testified to and that Anna Kline's motive in testifying against her husband was revenge. We have already noted the consistency of the other evidence with the admissions made by Phillip Kline. That the forehead wound is consistent with other objects, as well as a golf club, does not indicate inconsistency. Nor do we find an inconsistency between Miss Avey's description of the auto and the description of Kline's auto. She had the basic color and make correct, even though she could not recall if it was a two-tone. Her description of the man she saw fit that given of Garza by others at trial. The minor discrepancies between the admissions and other evidence are not sufficient to require a reversal of the trial court's factual finding on the question of credibility. As to the alleged revenge motive, we are not overlooking the strong evidence of Anna Kline's bias and prejudice against her husband. Neither did the trial court. However, as indicated, evidence independent of her testimony corroborates the admissions she testified were made by Phillip Kline. That was the key factor in the trial court's finding on credibility. We must also note that while revenge may have been the motive behind her disclosure of the admissions, such evidence of her bias does not establish that the substances of her disclosures were fabricated for the purposes of revenge. In this regard, it is worth noting that Anna Kline did not seek the police out, but they came to question her. Also to be noted, is the fact that in her statements to the police she faithfully reported that Phillip had denied participating in the beating and had indicated Garza was the killer. The evidence on motive was not such as to require the trial court to disbelieve her testimony. We find no error in the court's findings, and, accordingly, we find that there was sufficient evidence before the court for it to have concluded, beyond a reasonable doubt, that Phillip Kline participated in the murder of Bridgette Regli.

■■ The next issue raised by the defense is whether the court erred in restricting the cross-examination of Anna Kline when it refused to allow defense counsel to inquire into conversations Anna Kline had with an attorney about a possible divorce from Phillip. We find this issue to be groundless, in light of the other evidence admitted on the same subject. The trial court permitted counsel to ask Anna Kline if she had written to

Phillip to tell him she planned to divorce him. She admitted that she had written to him. Evidence from the defendant's father indicated that he received a letter from Anna's attorney about a divorce action and a property settlement. This sufficiently apprised the fact-finder of her feelings toward their marriage. The area where the court refused to allow cross-examination pertained to conversations between Anna Kline and her attorney. The court felt such conversations were confidential and privileged. Regardless of whether a waiver took place with the attorney's letter to Mr. Kline, it is clear that the contemplated divorce action was brought before the fact finder through other evidence. Where prejudice is lacking because similar evidence was introduced through other testimony, a trial court's evidentiary ruling disallowing duplicative evidence will not require reversal. (*People v. Limas* (1977), 45 Ill. App. 3d 643, 359 N.E.2d 1194.) There was no reversible error in the court's ruling.

■■ The court also refused to allow the defense to cross-examine Anna Kline about her alleged 1978 nervous breakdown. The defense purpose in seeking admission of the evidence was to demonstrate her lack of stability. It is well established that the scope of cross-examination is within the discretion of the trial court. (*People v. Blakes* (1976), 63 Ill. 2d 354, 348 N.E.2d 170.) It is evident from the record that the defense was given wide latitude, and utilized it, in seeking to establish Anna Kline's incredibility. They showed her adulterous relationships. They established her drug use and her drug peddling. They showed her valium intake over an extended time in 1978. They produced numerous witnesses who testified about her prior inconsistent statements and about her revenge motive in talking with the police. With all this evidence before it, in addition to Anna Kline's appearance as a witness, the court had ample basis to assess and judge the condition of Anna Kline and her credibility. The crucial focus in its determination, as noted previously, was whether her testimony about the 1975 admissions was credible. That she suffered a nervous breakdown in 1978 may have had some relevance to the question of her overall credibility, but the failure to allow such evidence did not prejudice the defendant, in light of the other evidence permitted on the same issue. There was no reversible error committed in the court's refusal to permit defense counsel to inquire as to the 1978 nervous breakdown.

The defense next charges that the defendant was denied due process because the prosecution did not reveal exculpatory evidence within its possession. The defense, however, is unable to substantiate this serious charge. There was no exculpatory evidence hidden by the State, nor is there sufficient evidence to show that the State misled or deceived the court in this case. The defense argues, to support its charge, that there were inconsistencies between the State's position in the trial of Phillip Kline and that in the trial of Arthur Garza. In the Garza trial, the State's

evidence indicated that Bridgette Regli had been hit with a tire iron, while in Kline's trial the evidence indicated a golf club. The pathology of the wound supported both theories. That the State's argument differed in the cases is the result of the differing evidence that was presented. There was no evidence, however, which conclusively indicated which instrument, if either, had been used. Had the State possessed such evidence (such as the tire iron), then such charges of misconduct might be on solid ground. Where the evidence was consistent with the use of either weapon, there was no deception or concealment practiced by the State in arguing as it did in the two trials.

Next, the defense claims that the State presented inconsistent evidence in the two trials on the question of whether the decedent was choked. The pathological evidence indicated that the decedent had scratches and bruises on her neck. That evidence indicated that she had been held, or grasped, with some pressure on the neck. That same evidence was presented at both trials. Given such physical evidence, the State was justified in arguing the reasonable inference therefrom, that the victim was choked. It was not suggested that the decedent was fatally choked, for the clear evidence was that she died of the blow to the head. The injuries to the neck area did permit the State to argue as it did, that some choking took place.

■■ The final charge of deception is made with respect to the presence or absence of a camera. The State, arguing from Phillip's admission and the circumstantial evidence, argued that a camera was taken from Bridgette Regli on the day of the murder. The defense argues that the State improperly concealed from it the fact that no camera was missing from the decedent's home. That fact was brought out in the Garza trial. That the evidence was presented in the Garza trial does not establish concealment in the Kline case. The State complied with discovery requests in the Kline case. The fact that police reports made no mention of the lack of a missing camera at the Regli residence does not indicate that the fact was improperly concealed from the defense. It is true that the State objected to a defense question of Mr. Regli about his daughter's ownership of a camera. However, the objection was proper, as the question went beyond the scope of the redirect examination. The objection was sustained. This is not evidence of concealment practiced by the State to mislead the court. Furthermore, we cannot agree with the defense conclusion about the lack of a missing camera at the Regli household. It is urged that the fact that no camera was missing from the Regli home indicates that Anna Kline's story is not true. Initially, we must again note that there is considerable other testimony lending credence to Anna Kline's testimony about the admissions. Also, as the State notes, it is possible that the camera taken in the killing was not Bridgette Regli's camera. It may have been the school's or

a friend's; the record is silent as to ownership of a camera. We fail to see that the credibility of Anna Kline's testimony is seriously undermined merely by the fact that Mr. Regli found no camera missing from his home. We conclude that there was insufficient evidence in the record to demonstrate improper activity by the State which prejudiced the defendant in this case. The allegations that the State concealed exculpatory evidence are not supported in the record.

■■ Two other evidentiary matters are the subject of the defense's assignments of error on appeal. The trial court permitted the State to question Anna Kline and Phillip Kline about Phillip's drug-selling activity. Over relevancy objection, the State was permitted to establish that Phillip Kline had extensively engaged in drug peddling activity with a variety of drugs. The evidence was not strictly limited to the day of the killing, December 6, 1973. The court admitted the evidence, stating that the evidence of his drug activity was relevant to the question of motive, in that the admitted motive for the killing was that a picture had been taken by the decedent of a drug transaction. Evidence of other crimes is admissible when it goes to establish motive, intent, identity, absence of mistake, or *modus operandi. (People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.) The State in this case, to substantiate the motive admission by Kline, needed to show that he had participated in drug transactions. The problem with the evidence admitted was that it was not specifically limited to a time period on or around December 6, 1973. Anna Kline was permitted to testify that Phillip was involved in numerous drug sales in 1973 at numerous locations. She testified that he sold drugs from the car, from his home and on the school parking lot. Jim Roberts, a defense witness, was permitted to testify, over objection, that he had been sold hashish, marijuana, speed and barbiturates by the defendant. Though it is broadly relevant to motive as established by the admissions, the evidence is obviously potentially very prejudicial.

■■ This was a bench trial. The evidence was admitted by the court for the purpose of showing a motive, and there is no indication that the trial judge, as fact-finder, considered the evidence for any other purpose or with any other effect. The record is to the contrary. The trial judge's references to drug activity in his findings were limited to activity on the day of December 6, 1973. This indicates that in reaching his decision to convict he considered the other crimes evidence as relevant only to motive and also that he considered only those narrowly focused upon the relevant time period. In addition, as already noted, his findings supporting conviction are firmly grounded in the evidence in the record. The record before us affirmatively supports a conclusion that the trial court did not rely upon or consider the improper evidence of other crimes when reaching its verdict in this case. We find no reversible error in the rulings

with respect to Anna Kline or Jim Roberts' testimony. For the same reason we find no reversible error in the evidence of drug activity brought forth in the cross-examination of Phillip Kline.

■■ Moving on from evidentiary matters, the defense contends that the defendant was unconstitutionally deprived of a judicial hearing on probable cause. The State, in this case, proceeded by way of indictment and no judicial probable cause hearing was held. The argument presented is that the statutory provisions which authorize prosecution of a felony either by indictment or by a judicial hearing on probable cause (Ill. Rev. Stat. 1979, ch. 38, par. 111—1) violate the equal protection and due process guarantees of the Illinois and United States Constitutions. This constitutional challenge is untenable.

■■ The defense next makes a constitutional attack upon the manner of indictment in this case, arguing that the State presented false and misleading evidence to the grand jury and that it withheld exculpatory evidence. The trial court, the record reveals, held a pretrial hearing on the defendant's motion to dismiss the indictment because of false and misleading evidence presented by the State. After reviewing the evidence and hearing testimony from the police officer who testified before the grand jury, the court denied the motion. It is obvious from that action by the court that it concluded that there had been no intentionally false or misleading evidence presented to the grand jury. That factual determination finds support in the record, and, accordingly, we find no reversible error in the decision of the court. The officer who testified at the grand jury had gathered a great deal of information from a number of witnesses and other sources. Neither he, nor the State, can be justly condemned for his failing to specifically detail, to the grand jury, those instances where a certain interviewee's statements indicated evidence or inferences favorable to the defendant. Nor do we find established that the officer intentionally misled the grand jury with his choice of words to describe how Kline and Garza were brought into custody.

■■ The defense alleges improper conduct because the State did not specifically indicate to the grand jury that it did not have an identification of either Garza or Kline's auto from Valinda Avey. Yet, the State did not inform the grand jury that they did have any such identification. That would clearly have been false and misleading. The State said nothing with respect to an identification by Avey, which is proper where no identification has been made. The trial court's finding that there was no intentional deception or concealment practiced by the State before the grand jury is supported in the record. Given that factual finding, we find no basis to reverse the conviction based upon a due process attack premised upon a contrary factual conclusion.

■■ The defense's final two arguments need not detain us long. It is

argued that the court ought to have created an exception in this case so as to permit the use of polygraph evidence from the defendant. We find, as did the trial court, that polygraph results have been denied consideration under any conditions in Illinois courtrooms. (*People v. Nicholls* (1969), 42 Ill. 2d 91, 245 N.E.2d 771; *People v. Monigan* (1979), 72 Ill. App. 3d 87, 390 N.E.2d 562.) We do not think an exception is warranted in the present case, and any exception to the clear rule against the admissibility of such evidence should be made by the Illinois Supreme Court. We would note, in passing, that the court was obviously apprised of the nature of the polygraph results from the mere fact that the defense wished to tender them.

The final issue is whether defendant's sentence of from 50 to 100 years is excessive, given the fact that co-defendant Arthur Garza, after his conviction in a separate trial, was sentenced to only 15 to 25 years and, also, that defendant Glen Schultz was sentenced to 20 to 25 years by the same judge who sentenced Kline for the same crime. The applicable law was recently stated by this court in *People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13:

> "When determining whether a sentence is excessive in light of a lesser sentence imposed on a co-defendant, consideration is to be given to the differences in criminal background and the degree of participation by each defendant in the commission of the offense. [Citations.] A disparate sentence may be supported by either a more serious criminal record [citation] or greater participation in the offense [citation]. Otherwise, defendants similarly situated ought to receive similar treatment in sentencing, as is required by fundamental fairness. [Citation.]" (See also *People v. Johnson* (1978), 59 Ill. App. 3d 640, 375 N.E.2d 1027.)

In both the *Martin* and *Johnson* cases, the co-defendants had received separate trials and disparate sentences. The principle stated in the *Martin* case was also clearly stated in *People v. Henne* (1973), 10 Ill. App. 3d 179, 180, 293 N.E.2d 172:

> "Fundamental fairness and respect for the law require that defendants similarly situated may not receive grossly disparate sentences."

This principle has been repeated in many cases such as *People v. Williams* (1977), 52 Ill. App. 3d 81, 367 N.E.2d 167, *People v. Jordan* (1970), 121 Ill. App. 2d 388, 257 N.E.2d 536, *People v. Martin* (1980), 81 Ill. App. 3d 238, 401 N.E.2d 13, *People v. Olmos* (1979), 77 Ill. App. 3d 287, 395 N.E.2d 968, *People v. Hodges* (1979), 69 Ill. App. 3d 113, 387 N.E.2d 29, *People v. Johnson* (1978), 59 Ill. App. 3d 640, 375 N.E.2d 1027, *People v. Stambor* (1975), 33 Ill. App. 3d 324, 337 N.E.2d 63, *People v. Schmidt* (1975), 25 Ill.

App. 3d 1035, 324 N.E.2d 246, and *People v. Prater* (1973), 12 Ill. App. 3d 452, 299 N.E.2d 26. These cases affirmed the principle that a grossly disparate sentence should be justified by the degree of participation in a crime or by comparison of the criminal records of the parties being sentenced for the same crime. The issue is one of "equal justice under law," a legend which is carved in stone at the entrance to the United States Supreme Court Building. The equal justice concept refers to a constitutional right which all persons have, and which does not permit us, as judges of a court of review, or the trial judge, to disregard this principle. All parties in such a situation, including defendant Kline, are entitled to no more, and no less, than the application of the principle in proper cases.

In the instant case, we have a situation where three persons were involved in the criminal act of murder of Miss Regli. They were all tried separately but the sentences involved in two of the cases were imposed by one judge (Judge Buchar) and the remaining sentence was imposed by another (Judge Michela). The sentence for defendant Kline was imposed on July 20, 1979, for a term of 50 to 100 years. The sentence imposed as to defendant Schultz (imposed by the same judge, Judge Buchar) on March 14, 1980, was a term of 20 to 25 years. The sentence as to defendant Garza was imposed on September 19, 1979, for a term of 15 to 25 years. It is apparent from the records that, without showing of a proper basis for the disparity, there has been a disparate sentencing as to defendant Kline, with the 50-to 100-year sentence, as opposed to a maximum of 25 years in the sentences for the other two participants in the crime.

■■ Even though the Kline sentence was imposed prior to the sentences imposed on Schultz and Garza, now, on direct appeal from the sentence of 50 to 100 years for Kline, such sentence is not final, but is subject to review on the appellate level, under applicable law, including the principles relating to disparate sentences to which we have referred in this opinion.

The question of maintenance or modification of the sentence of defendant Kline is subject to the test as to the criminal record of defendant Kline as compared with the criminal records of the other participants in the crime. Also, in addition to a review of the criminal records of the parties, consideration should also be focused upon the relative participation of the respective parties in the crime for which they have been convicted.

■■ We note that the State, in seeking to support the lengthy sentence imposed upon Kline, relied upon two murder convictions and a prior attempt murder conviction as to Kline in the Chicago area. We were then prepared to affirm Kline's sentence on the basis of his criminal record, including the Chicago convictions. However, while this appeal was pending and during oral argument, we were advised by the counsel for

defendant Kline that the case involving the asserted two murders and attempted murder had been reversed, so that there were no convictions as to Kline by reason of the case referred to. (See *People v. Kline* (1980), 90 Ill. App. 3d 1008, 414 N.E.2d 141.) We have, therefore, determined, in view of the precedents noted and the applicable law, to remand this cause, solely on the issue of the sentencing of Kline.

Remandment is made to the circuit court for a new sentencing hearing and a determination, under the applicable law as recited herein, as to the appropriate sentence to be imposed upon defendant Kline, and for the purpose of resentencing by such circuit court under the precedents herein cited. Accordingly, the conviction of defendant Kline is affirmed, but the sentence of 50 to 100 years heretofore imposed on defendant Kline is reversed and this cause is remanded to the Circuit Court of Will County for the limited purpose of conducting a sentencing hearing. Resentencing by the said court should be made in accordance with the views and legal precedents herein referred to.

Conviction affirmed; sentence reversed; cause remanded for resentencing hearing and resentencing of defendant Kline.

Mr. JUSTICE BARRY, specially concurring:

I concur unqualifiedly with the majority opinion.

However, given the import and tenor of Justice Heiple's dissent, and my total agreement with Justice Alloy's observations on the issue of sentencing, I believe a brief comment is in order.

I am of the opinion that consideration of any aspect other than disparity beclouds the sentencing issue in this case. Contrary to Justice Heiple's view, this is simply not another case wherein the discretion afforded the trial court judge in sentencing matters is claimed to have been abused. Rather, this is a case where there exists a gross disparity between the sentence received by defendant Kline and those subsequently received by his co-defendants following separate trials. The entire makeup of our court over the past 10 years has agreed that the subject of manifestly disparate, and therefore improper, sentences must be addressed. (*People v. Martin* (1980), 81 Ill. App. 3d 238, 401 N.E.2d 13; *People v. Johnson* (1978), 59 Ill. App. 3d 640, 375 N.E.2d 1027.) Therefore it is our duty to address the disparity present in this case, our personal beliefs and preferences notwithstanding.

As Justice Heiple himself states: "We should not disturb a sentence unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose." Here it cannot be seriously questioned that there exists among codefendants a gross disparity in sentencing. That disparity is not justified by the record before us.

To rule as Justice Heiple suggests is contrary to well settled law in this district and elsewhere. The defendant's sentence, therefore, warrants reconsideration.

As indicated by Justice Alloy, the Kline sentence is not final pending appellate review. Kline's sentence is, and should be, remanded for reconsideration with the benefit of these opinions.

Mr. JUSTICE HEIPLE, concurring in part and dissenting in part:

This is my second dissenting opinion in this case. The first precipitated some shoring up of the majority opinion, thereby necessitating the revision of this dissent.

This case involves the brutal torture murder of a 16-year-old girl, Bridgette Regli. The vicious killers were three depraved teenagers. Their names are Phillip Kline, Arthur Garza and Glenn Schultz, Jr.

After indictment, each defendant filed motions for separate trials. Separate trials were ordered.

Kline, opting for a bench trial, was tried in June of 1979 before Judge Robert Buchar and convicted. Kline elected to be sentenced under the former indeterminate sentencing act. On July 20, 1979, Judge Buchar imposed an indeterminate sentence of 50-100 years.

Garza, opting for a jury trial, was tried before Judge John F. Michela in August of 1979 and convicted. Garza elected to be sentenced under the former indeterminate sentencing act. On October 19, 1979, Judge Michela imposed an indeterminate sentence of 15-25 years.

Schultz, opting for a bench trial, was tried before Judge Robert Buchar in November of 1979 and convicted. Schultz elected to be sentenced under the former indeterminate sentencing act. On March 14, 1980, Judge Buchar imposed an indeterminate sentence of 20-25 years.

Kline, in his appeal, claimed that his sentence was excessive and should be reduced, the rationale being that Garza and Schultz received lesser sentences. The majority of this court has decided to reverse the sentence imposed on Kline for the sole reason of disparity. No suggestion is made that Kline is a nice person or that his conduct on the day of the torture murder was commendable. Neither is it suggested that the sentence *standing alone* is excessive. Rather, and contrary to law, logic and fact, a majority of this court has concluded that Kline "ought to have received similar treatment to that afforded Garza and Schultz." They reverse and remand the sentence.

It is significant to note that Kline was the first of the three defendants to be tried and the first to be sentenced. Thus, at the time Judge Buchar sentenced Kline to 50-100 years, Garza and Schultz had neither been tried nor sentenced. Judge Buchar had no way of knowing whether Garza and Schultz would even be convicted, let alone what their sentences would

be. He was not privy to the facts that were later to be brought out at the trials of Garza and Schultz. Nor was he privy to the facts that were later to be brought out at the sentencing hearings of Garza and Schultz.

Judge Buchar did have the benefit, however, of sitting through Kline's 12-day bench trial. He had the further benefit of sitting through an evidentiary sentencing hearing on Kline before he imposed the 50-100 year sentence. Considering the brutality of the murder and the circumstances surrounding it, and considering further the background and rehabilitative potential of this defendant, which was utterly lacking in mitigating circumstances, not even the majority of this court would be able to conclude that the sentence was excessive standing alone. What the majority is saying here is that Judge Buchar's sentence *was* correct when it was imposed on July 20, 1979, but that it became retroactively incorrect three months later when a different judge in a different case imposed a lesser sentence on a different defendant. The latter date was when Judge Michela sentenced Arthur Garza to 15-25 years. The majority opinion thus gives a greater power to Judge Michela than is possessed by either Judge Buchar who sentenced Kline or by this appellate court which is reviewing the sentence imposed on Kline. How so? Because on the date of Garza's sentencing, Kline's case was on appeal and Judge Buchar, the sentencing judge, had lost jurisdiction to reconsider or amend the sentence he had imposed on Kline. And it is a greater power than this appellate court has because, but for the lesser sentence imposed on Garza, this court lacked authority to reduce a sentence that was not excessive and did not involve an abuse of discretion by the sentencing judge. And there was no abuse of discretion and no excessive sentence imposed on Kline.

·The effect of this court's ruling is to delegate an *ex post facto* sentence reduction power to a trial judge who has only a collateral connection with the case at hand. It would follow logically from this line of reasoning that if Garza and Schultz had been acquitted at later trials, that Kline's conviction itself would have to be reversed. After all, they were similarly involved in the same crime and had similar backgrounds. As the majority has stated in their opinion, would not fundamental fairness, under such circumstances, require a reversal of Kline's . . . *conviction*?

Our supreme court has consistently held that it is not the function of a reviewing court to serve as a sentencing court. A sentence within statutory limits should not be reduced merely because the reviewing court would have imposed a different penalty. (*People v. Cox* (1980), 82 Ill. 2d 268; *People v. Perruquet* (1977), 68 Ill. 2d 149.) We should not disturb a sentence unless it clearly appears that the penalty constitutes a great departure from the fundamental law and its spirit and purpose. In this State, the spirit and purpose of the law are upheld when a sentence

reflects the seriousness of the offense and gives adequate consideration to the rehabilitative potential of the defendant.

A review of the record reveals that the trial judge carefully considered all the available evidence presented at the presentence hearing. No mitigating circumstances were presented at the hearing or in the presentence report. One primary factor in sentencing is the nature and circumstances of the offense. The 12 days of testimony at Kline's trial revealed a most repugnant story of the prolonged torture murder of a young girl. It could not be concluded on the basis of the record, that the trial judge erred in sentencing Kline to 50-100 years. Such sentences are not uncommon for a brutal murder, albeit a first offense. *People v. Collins* (1979), 71 Ill. App. 3d 815 (50-100 years); *People v. Lykins* (1978), 65 Ill. App. 3d 808 (70-150 years); *People v. Belvedere* (1979), 72 Ill. App. 3d 998 (75-200 years); *People v. Hayes* (1979), 70 Ill. App. 3d 811 (75-100 years).

Reversal of a sentence should only occur when we find abuse of discretion by the trial judge not merely because we would have balanced the appropriate factors differently if the task of sentencing had been ours. The actions of the majority, however, go even one step further and this is the most troublesome part of the majority's conclusion. The crux of their reasoning pivots on so-called disparity arising retroactive to Kline's sentencing. The defendant complains of no error during sentencing. The majority cites no error during sentencing. How then can a sentence, proper and reasonable when imposed, become wrong later? Is this sentence wrong because of another judge's leniency to another person in a later trial?

The majority concludes that the lesser sentence imposed on any one defendant must control the ultimate disposition of the other two. This is so even if the latter are tried in separate proceedings, with different witnesses, judges, or juries. In short, where multiple trials and multiple defendants are involved, a trial judge who believes a stiffer sentence is warranted cannot impose it. Inexplicably, the majority gives no reason why the lesser penalty as opposed to a higher one is proper. Moreover, no explanation is offered why the trial judge imposing the lesser sentence was more astute or better informed in his assessment of the evidence before him, than the judge meting out the higher penalty.

Justice Alloy, writing for the majority, cites a string of 10 cases culled from Shepard's Citations for authority. Two of the 10 cases were authored by Justice Alloy himself. Two were participated in by Justice Barry, who joins with Justice Alloy in the majority opinion. Further analysis discloses that several of the 10 cases incestuously cite each other for authority. Not all stand for the proposition claimed. There is a general rule of long standing in litigation that the weaker the position, the more important it is

to cite lots of authority. Liberal use of Shepard's Citations makes this job simpler.

Following the lengthy list of citations, the majority opinion goes on to point out that, "The issue is one of 'equal justice under law,' a legend which is carved in stone at the entrance to the United States Supreme Court Building." The type of stone is not indicated. But we may presume it was granite. Of course, it might be limestone, a much softer material, I understand, but one commonly used in public buildings. Or it could be marble. Softer yet. The majority opinion sheds no light on this point. We can only conjecture. But, carved it is, and "in stone." That is clear.

Justice Alloy particularly emphasizes the cases of *People v. Martin* and *People v. Johnson* to reach the conclusion that his ruling in the instant case is correct. Interestingly, both of these cases cite and rely on a former case written by Justice Alloy to reach their conclusions. That is *People v. Steg* (1966), 69 Ill. App. 2d 188. This is a clear case of pulling one's self up by one's own bootstraps. Even *Steg*, however, is distinguishable. For in *Steg*, the lesser sentence was imposed in the first trial by the first judge to impose a sentence. The reverse is true in the instant case. While *Steg* itself was a meretricious ruling, the present ruling is even worse by making all sentences on several defendants conform to the least sentence imposed on any defendant at any time and by any judge.

In the case at bar, the co-indictees could have been tried together but willfully chose otherwise. The motions to sever were filed shortly after indictment. Separate trials elicit different evidence and each judge, naturally, can only consider the evidence *he* heard in imposing sentence on the individual before him. Kline willfully chose the sentencing scheme which permitted the widest possible variance in sentencing. In so choosing, Kline protected himself from a possible natural life sentence without parole as provided by the other sentencing statute.

I have great difficulty in accepting the shorthand rendition of equal protection espoused by the majority opinion. That is, co-partners in crime should receive equal sentences. Reasons lawful and proper exist for varying sentences. Far more variance in sentencing is permissible under the statute elected by Kline than under the new statute, but judicial discretion in sentencing, nonetheless, is a time-honored principle and is to be affirmed barring abuse. The trial judge's firsthand observance of the witnesses, testimony, and the accused cannot be duplicated nor second-guessed. Moreover, if disparity ultimately results after the several trials of co-indictees, the defendant has the burden to show that there are factual reasons why the sentences should be identical. This Kline has not done.

Why are we to conclude that all sentences should be the same as the lowest sentence given? Why not the highest sentence? The obvious folly

of this demonstrates how such a blind quest for uniformity contorts both equal protection and individuality of sentencing.

Equal justice under law, or equal protection, means that justice shall be applied equally to the rich and the poor alike without regard to one's station, sex, class, race or position in life. It is fantasy to suggest that the statement stands for the proposition that where three convicted murderers have three separate trials, that the most lenient sentence imposed on any of the three controls what the maximum sentence shall be on the others convicted.

Equal protection means that each defendant shall be afforded the same rights and guarantees as provided by law. It does not mean that all trial judges, when dealing with co-indictees or defendants in similar cases, must reach the same conclusions regarding the sentence to be imposed. Each trial judge is free to make his own independent determination of the sentence to be imposed. This should not be disturbed on review unless there was clearly an abuse of discretion. The United States Supreme Court has held that disparity among sentences given to co-defendants does not violate the equal protection clause. The court reasoned that undue leniency in one case does not transform a reasonable punishment in another to a cruel one. *Howard v. Fleming* (1903), 191 U.S. 126, 48 L. Ed. 121, 24 S. Ct. 49.

The sentence of 50-100 years imposed on Kline for the torture murder of Bridgette Regli is reasonable. I cannot see how later lenient sentencing of his cohorts Schultz and Garza can transform Kline's reasonable sentence into an unreasonable one.

I concur with that part of the majority opinion which affirms the defendant's conviction. I dissent from that part which reverses his sentence and remands for resentencing.