THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JIMMY L. KELLEY, Defendant-Appellant.

(No. 72-164;

Second District—February 22, 1973.

Frank P. Vella, Jr., of Rockford, for appellant.

William J. Scott, Attorney General, of Springfield, and John B. Roe, State's Attorney, of Oregon, (James B. Zagel, Assistant Attorney General, of counsel,) for the People.

Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court:

A jury found defendant guilty of the offense of murder in the drowning of a 12-year old girl in Byron, Ogle County, on June 29, 1970. On appeal, defendant contends that the trial court erred in denying his motion to suppress as involuntary two separate oral statements.

Defendant had been questioned at the time of the occurrence. (It was he who had reported "a drowning" to several people, including the police.) He was not then charged.

The first statement which defense sought to suppress was made to one Duane Bailey, Chief of Police of South Beloit, with whom defendant had a prior acquaintance.

On the morning of July 30, 1970, defendant telephoned Bailey and, as a result of the call, they met at the Viking Restaurant in the City of Rockford, Bailey being accompanied by Detective Markley. It is undisputed that at no time during this meeting was defendant informed of his right to counsel or against self-incrimination. Bailey testified that he initiated the conversation by asking defendant the purpose of the meeting. Defendant replied that he had killed the girl in Byron and wanted to "get it off his chest"; that he would voluntarily go to South Beloit to give Bailey a signed statement; that after three days time (during which he and his fiancee were to determine if they would marry) he would take Bailey to certain evidence in Byron; and that he did not want to go into Ogle County sooner, in fear that he would be arrested. Bailey further testified that he had detected the odor of alcohol, that defendant stated he had been drinking, but that he (Bailey) did not believe defendant to be intoxicated. Promising to return to the restaurant shortly, defendant left to consult with his fiancee. Bailey and Markley waited, but defendant did not return.

Markley testified to the conversation, corroborating Bailey's testimony on all significant aspects except to state that he did not notice an odor of alcohol emanating from defendant.

Defendant testified that he had a history of drug and alcohol use; that on the morning in question, he became "high" after consuming twelve to fourteen alcoholic drinks and ten pills (claimed to be barbituates); that while he had called Chief Bailey that morning, it was Bailey who requested to see him; that when Bailey brought up the topic of the drowned girl, he said he had been arrested on suspicion, but that the subject was not further discussed. Defendant was arrested on August 3, 1970.

Three women, the manager of the restaurant, defendant's fiancee and another, were called by the defense. The manager testified that defen-

dant's manner at the time was somewhat unusual. The other two were of the opinion that the defendant was intoxicated.

Two expert witnesses were asked whether, under hypothetical facts, the mind of a person would be overborne by consumption of drugs and alcohol as testified to by the defendant. One concluded that the mind would be overborne, the other, that it would not.

■■ It is contended that the conversation was not "the product of a rational intellect and free will" in that defendant's "will was overborne" by his prior consumption of drugs and intoxicating liquors. In support of this argument defendant relies on *Townsend v. Sain,* 372 U.S. 293, 9 L.Ed.2d 770 (1963), wherein the defendant, while in police custody, was given a drug having the effect of a "truth serum." There the Court remanded the case for the purpose of taking evidence on the issue of whether the will of the defendant was overborne by drugs. Here, evidence on this point was heard and it was conflicting. It therefore became incumbent upon the trial court to determine, on the basis of the conflicting evidence, whether the statements should be allowed to go to the jury. Having done so, the trial court's decision shall not be reversed unless it is found to be against the manifest weight of the evidence or a clear abuse of discretion. *People v. Nemke,* 46 Ill.2d 49, 56 (1970), *cert.* den. 402 U.S. 924 (1971); *People v. Hicks,* 35 Ill.2d 390, 397 (1966), *cert.* den. 386 U.S. 986 (1967); *People v. Dogoda,* 9 Ill.2d 198, 202 (1956); *People v. Bryant,* 101 Ill.App. 2d 314, 319-320 (1968).

■■ Defendant points out that Bailey did not apprise him of his constitutional rights as provided in *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed. 2d 694 (1966). He admits the facts herein do not present an in-custody situation but argues that the failure to give *Miranda* warnings is relevant as one of the circumstances to be considered in determining voluntariness. The *Miranda* decision applies only to cases of custodial interrogation. *People v. Bey,* 45 Ill.2d 535, 538-539 (1970); *People v. Morehead,* 45 Ill.2d 326, 330-331 (1970), *cert.* den. 400 U.S. 945 (1970); *People v. Richards,* 120 Ill.App.2d 313, 342-343 (1970).

■■ The record shows that defendant and Bailey had been acquainted for some time prior to the events in question and considered themselves to be friends; the phone call and its resultant meeting were initiated by defendant; although Bailey was a law enforcement officer, the crime and the meeting took place without his jurisdiction and he at no time restricted defendant's freedom to terminate the interview or leave the premises. Under these facts, defendant's oral statements were given "freely and voluntarily without any compelling influence," and were admissible. *People v. Hicks,* 44 Ill.2d 550, 553-554 (1970), *cert.* den. 400 U.S. 845 (1970); *People v. Howell,* 44 Ill.2d 264 (1970), *cert.* den. 400

U.S. 846 (1970); *In re Orr,* 38 Ill.2d 417, 422-424 (1967), *cert.* den. 391 U.S. 924 (1968).

The second statement sought to be suppressed was made to arresting officer Robert Bales, a member of the State Police, after defendant was indicted, represented by counsel and incarcerated in the Ogle County jail.

On Sunday evening, August 23, 1970, Bales received a telephone call from the jailer informing him that defendant had requested to see him. Aware that defendant had been indicted and was represented by counsel, Bales went to the jail. On meeting, he asked defendant what he could do for him, to which defendant answered that he wanted to tell all about the drowning, wanted it written down, wanted to plead guilty to voluntary manslaughter and wanted a guarantee that Bales would not testify against him. At this point, Bales informed defendant that he would have to testify against him whether there was a written or oral statement, and asked if defendant had contacted his attorney about this meeting. Defendant responded, "I make up my own mind. I know what he wants and I know what I want. All he wants is my money and I want out of here * * *." As he began to explain his guilt more fully, Bales again informed him that he would have to testify to any confession, asked defendant not to confess and refused to write down defendant's admissions. Defendant continued to provide details of what had happened at the scene of the drowning. Bales then acquiesced to defendant's wishes by listening to his confession and questioned defendant on various aspects. The interview lasted about two hours but was not committed to writing. Although Bales testified to having given defendant the *Miranda* warnings at the time of his arrest, he admitted that the warnings were not repeated at this interview, except as heretofore related.

Defendant denied requesting the interview and remembered little of it except to recall that Bales attempted to convince him to plead guilty and promised to intercede with the prosecutor for a lesser charge. He did not recall saying he had killed the girl in Byron or discussing his right to have a lawyer present.

It is argued, based upon *Massiah v. United States,* 377 U.S. 201, 12 L.Ed.2d 246 (1964), that the statements made to Bales were inadmissible because they violated defendant's right to counsel. In *Massiah,* government agents obtained incriminating statements surreptitiously, after defendant, who was represented by counsel, had been indicted and was free on bail. The court there held the statements inadmissible on the ground that they had been obtained in the absence of counsel.

In *People v. Lagardo,* 39 Ill.2d 614, 616 (1968), the *Massiah* doctrine

was interpreted "to exclude all post-indictment incriminating statements obtained in the absence of counsel, even when not deliberately elicited by interrogation or induced by misapprehension engendered by trickery or deception." (See also, *People v. Halstrom*, 34 Ill.2d 20, 21-23 (1966).) In both of these cases the Court found that the presence of counsel had not been waived. This doctrine, however, does not make all post-indictment incriminating statements *per se* inadmissible. See, *People v. Milani*, 39 Ill.2d 22, 25-28 (1968).

In *People v. Smith*, 42 Ill.2d 479, 482-483 (1969), the defendant, immediately after being booked on the charge of burglary, arraigned and admitted to bail, gave an incriminating statement to the authorities. Admittedly not a post-indictment situation, the statement nonetheless was held to have been properly introduced since the defendant, before giving the statement, had expressly waived his right to have counsel present.

■■ Under the facts of the instant case, it is apparent that defendant was not only fully apprised of his right to counsel but that counsel had already been retained; that when Bales asked defendant if he had informed his attorney about the interview, defendant's answer was a statement disavowing any need for his attorney. Despite Bales' warnings to defendant against confession and his statement informing defendant that he would testify to any admissions, defendant insisted upon relating the details of the crime. Under these circumstances, it is clear that defendant knowingly and intelligently waived his right to the presence of counsel. We conclude that the *Massiah* doctrine is not applicable under the facts here present.

Finally, it is contended that the confession to Bales was not "the product of a rational intellect and free will."

Defendant testified that he told Bales that his cell-mate made him nervous and that he was going to kill him if he did not get out of jail. He testified that each day he was receiving pills (sedatives) which he stored and, that before Bales arrived, he consumed between ten and twelve of the pills at one time and took another during their interview. A jailer testified that on various occasions the defendant was found to be hoarding his medicine, and it was stipulated that the defendant's cell-mate would, if called, testify to defendant's having consumed at least eight pills shortly before requesting to see Bales.

Both Bales and the jailer testified that the defendant's condition at the time of the interview was no different from his condition on other occasions. The opinions of the same two experts, based upon the assumption that the defendant had devoured the number of pills claimed, varied,

one being of the opinion that defendant's statements would not have been the rational product of a free will, the other, that the quantity of pills would not have such effect.

■■ Again, based upon conflicting evidence, the trial judge was called upon to decide the voluntariness of this statement. Using the same reasoning expressed earlier herein, we find that the trial court did not commit reversible error in allowing the statement of August 23rd into evidence.

The decision of the trial court is affirmed.

Judgment affirmed.

SEIDENFELD, P. J., and ABRAHAMSON, J., concur.