The People of the State of Illinois, Plaintiff-Appellee, *v*. Phillip Sweet, Defendant-Appellant.

(No. 57549;

First District (5th Division)—January 11, 1974.

Charles A. Bellows, of Chicago (Jason E. Bellows and Ronald N. Heftman, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, William K. Hedrick, and Terrence McQuigg, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant was found guilty by a jury of murder and armed robbery and was sentenced to a term of 20 to 35 years. Prior to trial he moved for the suppression as evidence of an oral confession he made to a police polygraph operator and of the signed transcript of an inculpatory statement he made to an assistant state's attorney. A hearing was held and the motion was denied. At trial he objected to the admission of these statements into evidence. On appeal he contends that the court erred in failing to suppress the two incriminating statements. Without these statements, he argues, there was insufficient evidence to prove him guilty beyond a reasonable doubt.

During the early morning hours of December 26, 1969, Greg Clements, a gas station attendant, was shot and killed during the robbery of a Shell service station in Calumet City, Illinois. It was estimated that between $90 and $100 had been taken. Police investigators discovered two spent .45-caliber bullet casings and one spent .45-caliber bullet near Clements' body. These items were submitted to a crime laboratory for testing. Thirteen months later, on January 10, 1971, an Illinois State

Trooper investigating a traffic obstruction in Burnham, Illinois, discovered defendant and a companion, Robert Slota, asleep in their car. The trooper, seeing that defendant was carrying an automatic weapon, placed him under arrest and charged him with unlawful possession of a weapon and a traffic violation. Defendant explained to the police that he had bought the gun for $50 that night from a white male, about 45 years of age, at the Tally-Ho Lounge in Burnham. Defendant was released on bail. The gun he was carrying was taken to the Chicago Police Crime Laboratory where it was determined that this weapon had been used in the shooting of Greg Clements.

At the suppression hearing it was adduced that on January 14, 1971, defendant received a telephone call from the Calumet City Police Department requesting his assistance in determining the identity of the man who had sold him the gun. Since defendant's automobile was inoperative, a squad car was sent to bring him to the police station. Commander John Sullivan of the Calumet City Police Department testified that defendant arrived some time after 1:30 P.M. He informed defendant that the gun had been used in a homicide and that the police wanted to know how he had obtained it. Defendant reiterated the account he had given the State Police. Since it was thought that the man's photo might be in police files, defendant was given a "mug book" to examine. While he was looking through the "mug book" defendant changed his prior statement of how he had come into possession of the gun. He now said he bought it at a tavern in Thornton, Illinois, in December 1969 (a couple of days after the Clements shooting). Defendant volunteered to show this tavern to the police officers. He drove to this locale accompanied by police officers, then returned to the police station. Defendant was then told that his help in solving the Clements case would be appreciated. He was asked to return to the tavern in Thornton during the ensuing weeks since it was possible that he might once again see the man who had sold him the gun. Sullivan gave defendant his business card and asked him to call immediately if he saw the man. Sullivan told defendant that he was confused by the two versions of how defendant bought the gun. Defendant replied that the latter version was true and volunteered to take a lie detector test to verify this. An appointment was arranged with the polygraph section of the Chicago Police Crime Laboratory. Defendant inquired about the mechanics of taking a polygraph examination, asking whether it involved the use of injections through needles. Sullivan responded by explaining the difference between polygraph examination and the use of "truth serum." Sullivan then told two officers to transport defendant to the Chicago Police Crime Laboratory and to take him home after he had taken the examination. He asked if

defendant wished to call his home; defendant declined to do so. At all times Sullivan considered defendant to be a witness and not a suspect. Defendant was not in custody and was free to go if he desired. At around 7:00 or 7:30 that night Sullivan met again with defendant who told him he had not taken the lie detector examination because he had become confused. Defendant volunteered to take the test the following day. Sullivan replied, "If you're going tomorrow, why don't you go tonight?" Defendant agreed to take the test that night.

Officer Darrel Anderson of the Calumet City Police Department testified that he was assigned to transport defendant to the Chicago Police Crime Laboratory. His partner, Detective Richard Backlin, accompanied them. Defendant was placed in the back seat of their unmarked squad car. To their knowledge defendant was not in custody and was free to leave if he so desired. They had no conversation with defendant. Commander Sullivan instructed them to take defendant home after he had taken the lie detector test. They arrived at the crime lab at approximately 5:00 P.M. Defendant, accompanied by the polygraph operator, entered the lie detector room. After 45 minutes defendant emerged from the room. He said he had become confused and did not take the polygraph examination. He was then transported back to the Calumet City Police Station, and Commander Sullivan was informed of what had transpired. After defendant's conversation with Sullivan, they took defendant back to the crime laboratory, arriving at approximately 9:00 P.M. They were met by Bruce Thompson, the polygraph operator on duty. Defendant was left alone with Thompson. After they learned of defendant's confession to Thompson, they brought him back to the Calumet City station where he was informed of his rights, and he signed a waiver of these rights. They then transported defendant to the State's Attorney's office in the Criminal Courts Building in Chicago. In their presence defendant was interviewed by Anthony Onesto, an assistant state's attorney. They told Onesto that they were not present at the interview between the polygraph operator and defendant. They further stated that they had not advised defendant of his rights prior to his confession to Thompson.

Detective Backlin's testimony was substantially similar to that given by Anderson.

Glen Gilbreth was a polygraph operator on duty at 5:00 P.M. on January 14, 1971. He was to administer a lie detector examination of defendant. To his knowledge defendant was not suspected of murder. Following standard procedure he read to defendant an explanation of his *Miranda* rights and asked him to sign a waiver of those rights. Defendant was also presented with a waiver granting permission to disclose

the results of the test. He refused to sign the waivers and the interview was immediately terminated.

Bruce Thompson, a polygraph examiner, met with defendant at approximately 8:45. He read to defendant an explanation of his *Miranda* rights; defendant agreed to sign a waiver of them. He then told defendant that he would ask him questions about how he acquired the gun and about the Calumet City gas station murder. As part of his preparation for the administration of the polygraph examination he formulated the questions he would ask and discussed them with defendant. As he was completing these preliminary matters, defendant told him, "I had the gun at the time but I just meant to hit him with it." Defendant then proceeded to relate that he had been drinking heavily on the night of the shooting, that he went to the gas station and while holding the attendant at gun point took $89; that he told the attendant to turn around and walk ahead; that after walking a few steps the attendant turned his head; that defendant jumped back, hitting his shoulder on the door jamb and the gun went off; that the gun fell out of his hand and that when he picked it up, it discharged again.

Assistant State's Attorney Anthony Onesto testified that he interviewed defendant in his office in the Criminal Courts Building shortly after midnight on January 15, 1971. Backlin and Anderson informed him that they had not given defendant the *Miranda* warnings prior to his statement to Thompson, the polygraph operator. Defendant stated that he had been so warned by Thompson. Having no direct knowledge other than what defendant had told him as to whether defendant had been adequately advised of his rights, Onesto was fearful that the confession to Thompson was tainted by procedural error. This was explained to defendant. He then explained the *Miranda* rights to defendant who said he was conversant with them due to his experience with the Code of Military Justice. Defendant also said that he had been well treated and fed. Onesto asked defendant if he wanted to make a confession. Defendant said he did. A court reporter was brought in, at which time the defendant was again told that his prior statement might not be admissible in court. Defendant, stating that he understood the significance of this possibility, once more agreed to make a statement.

Defendant then confessed to the Clements murder. At 10:00 A.M. that morning Onesto again met with defendant. A transcript of defendant's statement was produced which defendant reviewed. Not knowing what had transpired earlier when defendant confessed to Thompson, Onesto once more explained to defendant the possibility that the confession to Thompson would be inadmissible due to procedural errors. He then

asked defendant to write his interpretation of their earlier discussion. He gave defendant time to consider whether he wanted to make a statement that would be admissible. Defendant wrote in the margin of the transcript:

"I understand that the police statement will not be admissible in a court of law. And can't be used against me in any way. But I will tell you of the crime."

Defendant then signed this statement and, after initialling each page, signed the entire transcript.

At trial Sullivan, Anderson, Gilbreth and Onesto testified substantially as they did at the pretrial suppression hearing. On defendant's motion the testimony of Gilbreth was stricken and the jury was instructed to disregard it.

Robert Slota, who had been arrested with defendant on January 10, was called by the State and testified that while incarcerated in the Calumet City jail defendant told him to say that the gun had been bought by defendant at the Tally-Ho Lounge that morning. After they were released defendant once again told him to say that defendant purchased the gun on the day he was arrested.

Defendant chose not to testify at the pretrial hearing. At trial he denied any involvement in the shooting of Clements. He was on leave from the Marine Corps during the Christmas holiday season of 1969. He remained at his parents' home from Christmas eve until noon on December 26. On January 9, 1971, he purchased the gun that was found on his person. When he went to the Calumet City Police Station on January 14, 1971, Commander Sullivan told him that the police had enough evidence to charge him with murder. In addition to Sullivan, other police officers questioned him. Sullivan told him that he had to take a lie detector test and that if he refused, he would be given a shot of sodium pentothal (so-called "truth serum"). Sullivan said that this was normal procedure in a homicide investigation. For this reason he agreed to take a polygraph examination. When he learned from Gilbreth that he did not have to take a lie detector test or "truth serum," he refused to submit to the examination. He told the officers who had taken him to the Chicago Crime Laboratory that he wanted to go home; they, however, returned him to the Calumet City station. There Sullivan talked him into returning to Chicago to take the test that night. When he was brought back to the crime lab, a new polygraph operator recited the *Miranda* warnings to him and he signed a waiver of rights form. The examiner told him that if the test showed that he was involved in the murder, he would be charged with the crime and could be sentenced to death. He was also told that the shooting could have been something other than murder,

such as manslaughter or an accident. He then made a confession to the polygraph operator. At that time he had been in police custody for ten hours and was mentally and physically exhausted. He was taken back to Calumet City, booked for the crime and then driven to the Criminal Courts Building in Chicago. There he was interrogated by Onesto. He gave a detailed confession using information about the shooting gleaned from Sullivan's interrogation of him. At 8:00 A.M. on January 15, 1971, he was first taken to the Midlothian Court House and then removed to the Criminal Courts Building in Chicago. He met with Onesto who dictated a statement purporting to affirm his willingness to confess. (This statement is referred to above.) After he signed the statement he was taken back to the Midlothian Court House where he was arraigned.

Members of defendant's family testified that on December 26, 1969, defendant did not leave their home until at least 9:30 A.M. They also claimed that the three cars owned by the family were not in operating condition on the day of the crime.

OPINION

Defendant first contends that his confession to the police polygraph operator was involuntary.

■■■ Where a confession is challenged as coerced, the burden is on the State to prove by a preponderance of the evidence that it was given voluntarily. (*People v. Jackson*, 41 Ill.2d 102, 242 N.E.2d 160; *People v. Harper*, 36 Ill.2d 398, 223 N.E.2d 841.) This determination is to be made by the trial judge and, taking cognizance of his superior position to assess the credibility of witnesses, a court of review will not overturn this decision unless it is contrary to the manifest weight of the evidence. (*People v. McGuire*, 39 Ill.2d 244, 234 N.E.2d 772, *cert. denied*, 393 U.S. 884; *People v. Hudson*, 38 Ill.2d 616, 233 N.E.2d 403.) Here defendant claims that he made his inculpatory statement only after being in police custody for hours, the subject of coercive threats and almost unrelenting interrogation. An examination of the record, however, reveals that only his own trial testimony will support this interpretation of the events of January 14. The testimony of Commander Sullivan, the transport officers and Thompson, one of the polygraph operators, indicates that defendant at all times prior to his confession was considered to be merely a witness assisting the police in their investigation of a crime. Far from being in custody, they stated that he was free to go if he so desired. Although defendant claims that his decision to take a lie detector test, and his consequent confession, were solely the result of police threats, it was Sullivan's unequivocal testimony that he volunteered to take the polygraph examination and Thompson's that the confession was made spontaneously during a preliminary discussion of test procedures.

Moreover, it seems reasonable that the police would not consider defendant a suspect for the Clements shooting merely because he was found with the murder weapon almost 13 months after the crime. The fact that defendant chose to waive his right to remain silent despite his knowledge of constitutional protections derived from his military service is also to be noted in considering the voluntary nature of his confession to Thompson. We, therefore, do not believe that the circuit court's determination on this issue was contrary to the manifest weight of the evidence and we will leave its ruling undisturbed.

Defendant has also argued that his refusal to undergo a polygraph examination when he was first taken to the Chicago Police Crime Laboratory constituted, under the doctrine of *Miranda v. Arizona*, 384 U.S. 436, an exercise of his right to remain silent and, therefore, any further questioning of him should have been precluded. The *Miranda* rule applies only in instances of custodial interrogation. Here it was demonstrated that defendant was not in custody, but rather that he was a witness voluntarily assisting the police in their investigation of a crime. Under these facts the *Miranda* rule does not apply. *People v. Bey*, 45 Ill.2d 535, 259 N.E.2d 800; *People v. Kelley*, 10 Ill.App.3d 193, 293 N.E.2d 158; *People v. Richards*, 120 Ill.App.2d 313, 256 N.E.2d 475.

■■ Since we find that defendant's confession to Thompson was properly before the jury, there was a sufficient evidentiary basis to prove him guilty beyond a reasonable doubt, and, therefore, we need comment only briefly on his second contention that his statement to Assistant State's Attorney Onesto was involuntarily given. The essence of defendant's claim is that the failure of the police to present him for preliminary examination at the earliest possible moment renders his confession to Onesto involuntary, per se. Even if we accept defendant's assertion that the State failed to follow the prescription of the relevant statute (Ill. Rev. Stat. 1967, ch. 38, par. 109—1) in unnecessarily delaying his presentment before a judge, this would be but a single factor to consider in determining the voluntariness of the confession. (*People v. Mallett*, 45 Ill.2d 388, 259 N.E.2d 241.) Viewing the totality of the circumstances that surround this incriminating statement, it becomes apparent that defendant was advised of his rights and that in signing the waiver form, he claimed a knowledgeable familiarity with them. His decision to confess was made despite the fact that Onesto, fearful that some procedural bar would preclude the use of defendant's earlier statement in court, advised him of this possibility on several occasions. Furthermore, it was Onesto's testimony that defendant related that he had been well treated by the police. We, therefore, do not believe that the treatment afforded defendant in the hours between his arrest and his

presentment were so unreasonable or oppressive as to coerce him into making a confession.

For the foregoing reasons we affirm the judgment entered by the trial court.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.