THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GLENN SCHULTZ, JR., Defendant-Appellant.

Third District    No. 80-203

Opinion filed August 27, 1981.—Rehearing denied September 29, 1981.

John T. Kelly, of Orland Park, for appellant.

Edward F. Petka, State's Attorney, of Joliet (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Glenn Schultz, Jr. appeals from his conviction, after bench trial, for the 1973 bludgeon murder of Bridgette Regli, a 16-year-old Crete-Monee High School student. Two other men, Arthur Garza and Philip Kline, have been convicted of murder for their participation in the killing of Miss Regli. Those convictions have been upheld by this court. (*People v. Garza* (1981), 92 Ill. App. 3d 723; *People v. Kline* (1981), 99 Ill. App. 3d 540.) Glenn Schultz, Jr., following his conviction, was sentenced to 20 to 25 years' imprisonment for his part in the murder. Garza had received a 15- to 25-year sentence, while Kline was given 50 to 100 years. Kline's sentence has been reversed, as improper, and his case has been remanded solely for resentencing. (See *People v. Kline* (1981), 99 Ill. App. 3d 540.) On this appeal Schultz argues: (1) that he was not proven guilty beyond a reasonable doubt; (2) that the State failed to exclude other reasonable hypotheses consistent with his innocence; (3) that he was denied due process when the trial judge improperly investigated certain evidence admitted at trial; (4) that he was denied due process when evidence of other crimes was admitted; (5) that the right to a speedy trial was denied him; (6) that the State failed to show that *Miranda* warnings had been given him prior to the making of his incriminating statements; (7) that his right to an attorney was denied him when he was asked questions, after his indictment, without an attorney present; (8) that his sentence was excessive, in light of the sentences received by a co-defendant for the same crime.

The facts of this brutal murder have been covered, for the most part, in the two previous cases involving Philip Kline and Arthur Garza. Only a brief summary of the evidence common to all three cases will be set forth herein.

On December 6, 1973, Bridgette Regli, a 16-year-old high school

student at Crete-Monee High School, was bludgeoned to death in a Will County field. She had breakfast that morning at her home and then had gone to school. Shortly before 1 p.m., having completed her classes for the day, Miss Regli left school and began her usual walk home. Valinda Avey, an acquaintance of hers, looking out a window at the junior high school nearby, saw Miss Regli walking down the street toward home. She then observed a small, two-door, tan or cream colored auto stop past where Bridgette Regli was walking. She noticed two persons in the auto, but was unsure if there was a third in the back seat. Avey observed a high-school-age male get out of the passenger side of the auto, and Bridgette Regli get in the auto. The car was then driven off in a southerly direction.

Bridgette Regli's body was found several days later in a wooded area of Crete Township. Pathological evidence indicated that, after considerable struggle on her part, the victim had been bludgeoned to death with a tree limb or other similar object. Death occurred some seven hours after her last meal, which would put the time of death in the early afternoon of December 6, 1973. Clutched in Regli's frozen hand were several strands of human hair. Some years later, on March 2, 1976, two police officers had occasion to talk with defendant Glenn Schultz, Jr. The officers, responding to a radio call, had found Schultz lying intoxicated and unresponsive in some bushes. He had to be carried home by the officers, and during the ride Schultz rambled about his need to be taken to a mental hospital. After returning him home, where both his mother and brother were present, the officers heard Glenn Schultz, Jr., state, "Do you remember that girl in Crete? I killed her. I did it." One of the officers asked him if he meant the blond, and he responded, "No, the brunette." He also indicated to the officers that the killing took place a couple of years before. The defendant Schultz was then hit by his brother and told to "shut up." The officers left without arresting Schultz at that time.

Several weeks later, on March 16, 1976, Glenn Schultz was asked to come to Richton Park Police Department to be interviewed by officers there. He had not been arrested and voluntarily came to the police station for the interview. He was interviewed by an Officer Mooney upon his arrival. According to Mooney's testimony at trial, Schultz told him that he knew a lot about the murder in Crete and wanted to talk about it to get it off his mind. During the interview, Schultz told Mooney that he remembered that on the day of Regli's disappearance there was a "hassle or a struggle" and something about a car. Schultz also stated that he remembered being in a wooded area and seeing the back of the victim's head. He could not describe her facial features, indicating that in his recollection all he saw was the back of her head and himself beating her. When Mooney asked what he was beating her with, Schultz replied that it was a

tree limb. Schultz then became upset, began sobbing and saying that it had been a "bad trip." Later, in again recounting the events, Schultz stated, "No. No. No. I couldn't do that. I couldn't do that." Responding to further questioning, Schultz indicated that he had dreams of being in a wooded area and trying to bury something. Later that day, Schultz told Mooney that he "thought he purchased some drugs the day the girl disappeared," indicating that he thought he had purchased them from Philip Kline, but was not sure. At trial, Officer Mooney stated that the conversation with Schultz had been taped but that the tapes had been misplaced over the years and could no longer be found.

Another police officer who interviewed Schultz at the police station that day also testified to statements made by Schultz. Will County Sergeant John Watters testified that he interviewed Schultz that day at the Richton Park Police Station. He testified that Schultz, during the interview, informed him that he knew both Philip Kline and Arthur Garza. Schultz again indicated his belief that he had purchased drugs from Kline on the day of the victim's disappearance. Watters asked him directly whether he had participated in the murder and he replied, "I think I did but I know I didn't." He mentioned his recurring dreams about the homicide and could remember trying to bury something. During the interview Schultz indicated to police that he had closely followed the case in the local newspapers. A police report concerning the interview was prepared by Watters.

Watters testified that he did not place the defendant under arrest at that time, because he was waiting for the results of testing being done to compare hair samples taken from Schultz with the hair found in the victim's hand. Watters also indicated that he wanted to discuss the case with the State's Attorney. Sometime later, after being informed that the hair comparison was positive and that it indicated a similarity between Schultz' hair and that found in the victim's hand, Watters further discussed the case with the prosecuting authorities, but no action was taken.

Sometime in January 1979, after the police received information regarding incriminating admissions made by Garza and Kline, an indictment was returned against Glenn Schultz. This was almost three years after the confessions by Schultz to police officers and the positive results from the hair comparison. An arrest warrant was issued and Schultz was picked up by a county sheriff's deputy in Florida on January 28, 1979. The Schultzes had moved to Florida from Illinois some years before. The deputy who made the arrest testified at trial that Schultz told him that he could not understand why the arrest was taking place, "that he had confessed to this, that he had been arrested for this and he had subsequently been released from this charge from the State of Illinois." He also

indicated that at the time of the offense he was "burnt out" on drugs and was not coherent enough to know exactly what had happened. A defense motion to suppress the statements made by Schultz at the time of his arrest in Florida was denied. The officer involved indicated that he had read Schultz his *Miranda* rights prior to any questioning.

Further testimony for the State came from Timothy Dixon, a supervisor with the Illinois Crime Lab. Dixon testified to his experience with the crime lab and to his examination of the hair strands taken from the hand of Bridgette Regli compared with the hair samples taken of Glenn Schultz, Jr., in 1976. Dixon testified that the hair in the victim's hand was dissimilar to her own hair. He also testified that his examination of the defendant Schultz' hair and the hair in the victim's hand indicated that the two samples were similar in color and characteristics. He also testified that he had concluded as well that certain hair recovered from the gloves found in the back seat of Philip Kline's auto in Florida, in 1973, was similar in color and characteristics to the hair samples taken of defendant Schultz.

On cross-examination, Dixon testified that he had not used an electronic scanning microscope in his examination, although one was available. He admitted that he did not conduct several tests and comparisons which he could have utilized. He did not make a square count of the hairs available, nor did he send the samples to Chicago for a neutron-activation analysis test. Dixon also stated that he did not use a cross-sectioning technique in his analysis. He admitted that hair comparison study was an inexact science and that positive identifications were available only where there were rare and unique elements present in the samples. He stated that his conclusions about the similarities in the instant case were based upon his examination of the samples using both the naked eye and a microscope. He stated that he could not conclude, with scientific certainty, that the hair samples taken from the victim's hand were from the head of defendant Glenn Schultz.

After its directed verdict motion had been denied, the defense presented its case. The principal witness was Dr. Louis Vitullo, a retired consultant with the Chicago Police Department. Dr. Vitullo's background and expertise in the field of hair comparison study was established. Vitullo, faulting Dixon for not measuring and washing the samples before examination, testified that he too had conducted a microscopic analysis of the hair samples. His conclusion was that he found dissimilarities between hair strands found in the victim's hand and that taken from defendant Schultz. He found similarities in color between the two, but dissimilarities with regard to pigment and structure. Based upon his examination, Vitullo stated that he could not render a decision as to the source and origin of the hair found in the victim's hand. Vitullo also discussed a variety of tests

that could have been utilized to examine the hair, stating that through the use of such sophisticated testing a better result could have been obtained.

Another defense witness was Anna Kline, former wife of Philip Kline who had testified against Philip Kline at his trial. (See *People v. Kline* (1981), 99 Ill. App. 3d 540.) She testified that, so far as she knew, her husband, Philip Kline, did not know Glenn Schultz and that he never spoke of him. Also testifying for the defense was Glenn Schultz, Sr., who testified that the Crete papers during the weeks following the killing contained numerous articles concerning the murder of Bridgette Regli. Following the close of evidence, final arguments were made to the court in this bench trial.

Thereafter, the trial court entered its verdict of guilty, finding that the State had corroborated the admissions by the defendant and concluding that Schultz had been proven guilty beyond a reasonable doubt. He was sentenced to a term of from 20 to 25 years in prison for his participation in the killing. From that conviction and sentence he now appeals. Any further factual development will be presented, as needed, within the discussion of the issues raised on appeal.

■■ ■ The first issue raised by the defendant is whether the State's evidence was sufficient to prove him guilty beyond a reasonable doubt. The defense position is that the admissions by Schultz are so vague and contradictory, and the circumstances of their elicitation so questionable, that there exists serious doubt as to their probative value. It is also argued that the circumstantial evidence concerning the murder is not sufficiently corroborative of the admissions, again raising doubt about their probative value in the case. It is a well-established principle that questions of credibility and weight over evidentiary matters are for the trier of fact, especially where the evidence is conflicting. As a result, it is held that a reviewing court will not reverse a trial court's findings of fact unless the evidence is so improbable as to raise a reasonable doubt of the defendant's guilt. (*People v. Ellis* (1978), 74 Ill. 2d 489, 384 N.E.2d 331.) The trier of fact may accept all, part or none of a defendant's confession (*People v. Garza* (1981), 92 Ill. App. 3d 723, 729), and discrepancies between a confession and the physical evidence are for the trier of fact to assess. *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466.

In the present case, defendant Glenn Schultz was shown to have made several incriminating statements to police concerning his participation in the 1973 killing of Bridgette Regli. The first, given in March of 1976, while he was intoxicated and obviously unstable, was his statement to police officers, "Do you remember that girl in Crete? I killed her. I did it." He further indicated to the officers that the killing had occurred several years before 1976 and that the girl was a brunette. The details of this admission fit the evidence concerning the Regli murder. Bridgette

Regli was killed in Crete several years before the Schultz admission, and the testimony of two officers indicated that her hair was a "brownish-red" or "reddish-brown" in color. The pathologist who examined the body testified that the hair was brownish-blond in color. While these details correspond, given the circumstances of the admission, including the defendant's condition and the generality of his statements, his admission that night to police would, standing alone, be insufficient to convict. The State's case was not based upon that confession alone, however.

■■ Later that same month in 1976, a sober and more coherent Glenn Schultz, Jr., again talked with police officers and again admitted killing the girl in Crete. These admissions occurred during interviews at the Richton Park Police Station where Schultz had come voluntarily after being asked to do so by the police. He talked of a hassle or struggle, involving a car, and that he remembered being in a wooded area and beating the back of the girl's head with a tree limb. These admissions were also consistent with the evidence concerning Bridgette Regli's death. Evidence had been presented that she was picked up in an automobile and taken to a wooded area in Crete Township. There was also pathological evidence of a considerable struggle, and the body was found in a wooded area, having been beaten over the head with a tree limb or similar object. There is the further admission by Schultz that he knew both Garza and Kline, the others convicted in the murder, and that he may have purchased drugs from Kline at school on the day of the murder. Added to the correspondence between the details of the Schultz admissions concerning the crime and the other evidence in the case is the testimony by the police lab expert that the hair found clutched in the hands of the victim was similar to that taken from the defendant Glenn Schultz. When all of the evidence is considered, especially the similarity between the details in the admissions and the physical facts concerning the murder, we find that the State presented sufficient evidence to support the court's conclusion that Glenn Schultz, Jr., was guilty beyond a reasonable doubt of the murder of Bridgette Regli.

■■ The defense argument to the contrary is not persuasive. That Schultz at times during the interviews denied his participation, or had doubts about it, does not establish the unreliability of his incriminating statements. Nor does the fact that police reports concerning the interviews omitted details later testified to at trial by the officers necessarily indicate that the officers' testimony is unreliable. Such questions of credibility and weight, as previously noted, are for the trier of fact to determine. Similarly, any discrepancies between the physical evidence and the admissions are to be assessed and passed on by the trier of fact. (*People v. Garza* (1981), 92 Ill. App. 3d 723, 729.) We do not view the admissions by Schultz as being so contradictory and vague that it must be concluded

that they are unreliable. The minor discrepancies focused upon by the defense do not require such a conclusion. The defense requests that we take judicial notice of the records in the *Garza* and *Kline* cases which, according to the defense, indicate that only those two persons were involved in the killing. Yet, it must be noted that Garza admitted that three people were involved. (See *People v. Garza* (1981), 92 Ill. App. 3d 723, 727.) We find that the State's evidence was sufficient to support the conviction of Schultz for murder.

The defense faults the State for not excluding other reasonable hypotheses from the evidence which would be consistent with defendant's innocence. Specifically, the defense argues that the evidence can be taken to indicate that Schultz was suffering from mental disturbances, including dreams and hallucinations, resulting from his drug intake, and that his admissions concerning the killing were a result of his mental instability and the fact that he followed newspaper articles concerning the Regli killing, and not the result of personal recollections of the events described by him. That the evidence was susceptible of such an innocent construction does not require the trier of fact to believe it or the State to refute it. As repeatedly noted, questions of weight and credibility are for the trier of fact to determine. Contrary to defense assertion, the case for the State did not rest on circumstantial evidence alone, but on admissions of guilt by the defendant which were corroborated by the circumstantial evidence. See *People v. Gray* (1980), 85 Ill. App. 3d 726, 410 N.E.2d 493; *People v. Godsey* (1978), 57 Ill. App. 3d 364, 373 N.E.2d 95.

The next contention advanced by the defense is that the defendant was denied his right to due process when the trial judge conducted a private investigation of the hair samples admitted at trial. This was a bench trial. Five days after the close of evidence, and prior to his decision in the case, the trial judge called the attorneys into his chambers and visually examined five envelopes marked as containing hair samples, which were offered into evidence. After examining the samples contained in three of the envelopes (two contained no samples), the judge stated that there were nonmounted hair strands available for the defense expert to have examined. The defense objects that no testimony was offered at trial to indicate that the hair strands in the envelopes, which had been supplied the defense expert, were suitable for testing. The defense concludes that through this improper examination of the evidence, the trial court improperly evaluated the credibility of the defense expert on a basis outside of the record and the evidence therein.

Certainly, as the defense states, triers of fact, whether the court or a jury, are not permitted to conduct independent experiments or private investigations which provide additional evidence not introduced at trial. (*People v. Wallenberg* (1962), 24 Ill. 2d 350, 181 N.E.2d 143.) However, it

is also established that the trial judge, as trier of fact, can examine the physical evidence introduced at trial. (*People v. Gilbert* (1977), 68 Ill. 2d 252, 369 N.E.2d 849.) The latter is what occurred in the instant case. The defense expert, at trial, stated that he could not perform additional tests because the hair samples provided him had been permanently mounted on slides by the State's expert. He did admit, however, that there were other hair samples available for testing that were taken from the victim's hand and that were unmounted. The trial court's comment, after examining the samples admitted into evidence, simply questioned why the defense expert, who testified that he could reach no conclusion concerning the samples, did not perform tests on the available hair samples. It has not been shown that the court examined or relied upon evidence not properly in evidence or that it relied upon private knowledge concerning the evidence. Even assuming, *arguendo*, the impropriety alleged by the defense in the court's examination of the evidence and his conclusions therefrom, we find such error to be harmless, given the other substantial evidence indicating the defendant's guilt. We have already examined and discussed the admissions of the defendant and the corroboration to those admissions which is provided by the circumstantial evidence concerning the killing. That evidence was fully sufficient to convict Schultz of the murder, and any error or impropriety in the court's assessment of the availability of hair samples for testing is harmless.

■■■ The defense next asserts that the evidence concerning other crimes of the defendant was improperly admitted by the trial court and that the admission of the evidence was so prejudicial as to require a reversal of the conviction. Specifically, the defense objects to introduction into evidence of a police officer's testimony that Schultz admitted that he may have purchased drugs from Philip Kline at the high school on the day of the killing. As a general rule, evidence of other crimes committed by a defendant, independent of the crime for which the defendant is being tried, is inadmissible. If relevant, however, for any purpose other than to show propensity to commit a crime, evidence of other crimes is admissible. (*People v. Baptist* (1979), 76 Ill. 2d 19, 27, 389 N.E.2d 1200; *People v. De La Fuente* (1981), 92 Ill. App. 3d 525, 414 N.E.2d 1355.) The State, in the instant case, argues that the evidence was properly admitted to show Schultz' presence at the high school on the day of the victim's disappearance. The evidence indicated that Bridgette Regli was picked up by persons in an auto shortly after she left high school on December 6, 1973. It was also established that the auto she entered was similar in size, color and make to that driven by Philip Kline on that day. The defense argues that the evidence of a drug transaction had no probative value and that it was inflammatory and prejudicial. We find that the evidence was admissible as relevant to the defendant's presence at the school on the day

in question and to his association with Philip Kline on the day of the victim's disappearance. Moreover there is no indication that the court inferred the defendant's guilt from his conduct in the drug activity. This was a bench trial, and a trial judge is presumed to have considered only competent evidence in arriving at his findings. (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649.) The trial judge's comments concerning the purpose of the evidence indicate that he considered it only to show that Schultz was present at the high school on the day of the killing and that he associated with Philip Kline on that day. As the defense notes, the danger from admission of other crimes evidence is that a trier of fact will convict on the basis of the evidence about other crimes, and not on the basis of the evidence concerning the crime charged. This danger is greatly reduced where the trier of fact is not a jury but a trial judge. In the instant case, there is nothing to suggest that the trial court in any way based his judgment of conviction for the murder upon the fact that Schultz had purchased drugs or was a drug user. Rather, as noted, the court properly used the evidence as indicating the presence of Schultz at the school and his association with Kline on the day of the victim's disappearance from the school area. There is no indication that the court considered the evidence as establishing a motive for Schultz in the killing or based its guilty verdict merely on Schultz' association with Kline. We find no reversible error in the admission of the testimony concerning the drug purchase by Schultz on the day of the victim's disappearance and death.

■■ A second due-process argument is also presented by the defense. It is argued that the defendant was denied his due process right to a speedy trial where there was a 34-month delay between the time when the evidence against him was secured and the time of his indictment. His confessions to police officers in Illinois occurred in 1976, as did the testing of hair samples. As indictment against Schultz in the murder of Bridgette Regli was not returned until January 1979. The test to determine whether a preindictment delay is violative of due process was set forth in *People v. Lawson* (1977), 67 Ill. 2d 449, 459, 367 N.E.2d 1244:

> "Where there has been a delay between an alleged crime and indictment or arrest or accusation, the defendant must come forward with a clear showing of actual *and* substantial prejudice. Mere assertion of inability to recall is insufficient. If the accused satisfies the trial court that he or she has been substantially prejudiced by the delay, then the burden shifts to the State to show the reasonableness, if not the necessity, of the delay.
>
> If this two-step process ascertains both substantial prejudice and reasonableness of a delay, then the court must make a determination based upon a balancing of the interests of the defendant and

the public. Factors the court should consider, among others, are the length of the delay and the seriousness of the crime."

In support of his motion to dismiss the indictment on these due-process grounds the defendant pointed to the unavailability of two witnesses who he hoped would be helpful to him in recalling the events of December 6, 1973. A further claim of prejudice was premised upon the fact that during the period between his confessions and indictment the police had lost a tape recording of one of his statements, a police report concerning them, and a copy of his signed *Miranda* card. The trial court denied the motion to dismiss the indictment, and we affirm that decision. No sufficient evidence of actual and substantial prejudice was shown from the alleged inability of the defendant to locate several witnesses. No showing was made concerning the efforts of the defense to locate the witnesses nor concerning the significance of their testimony had they been available. The defendant testified only that he thought the witnesses could assist him in recalling his whereabouts on the day of the murder. With respect to the lost tape recording, the lost police report and the lost *Miranda* card, no substantial and actual prejudice was shown. The defense speculates that the availability of these items would have permitted it to more effectively cross-examine the State's witnesses. While recognizing the possible usefulness of those items to the defense, especially if they indicated some contradiction with the officers' trial testimony, the fact remains that the asserted prejudice is speculative as regards the lost items. The possibility of prejudice is not sufficient. (*People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.) The lost items may have contradicted the officers or they may have fully supported them. In any event, the defense was given full opportunity to cross-examine the witnesses and to probe and question their reliability and accuracy in recollecting the interviews. The trial court assessed the asserted prejudice and concluded that the evidence was insufficient to establish an actual and substantial prejudice to the defendant from the delay. We find no error in the court's decision rejecting dismissal of the indictment based upon these due process grounds. There was no necessity to reach a balancing of the interests between the defendant and the public where no substantial and actual prejudice was shown.

The defense next contends that the State failed to meet its burden of showing that *Miranda* warnings had been given to the defendant prior to his statements to police at the station in March, 1976. A motion to suppress was filed in which defendant alleged that he was not given any *Miranda* warnings prior to being interviewed. The trial court, after hearing the contradictory evidence concerning the warnings, denied the motion. It is established that a reviewing court will not reverse a trial court's decision

on a motion to suppress unless that decision is contrary to the manifest weight of the evidence. *(People v. Wipfler* (1976), 37 Ill. App. 3d 400, 346 N.E.2d 41, *aff'd* (1977), 68 Ill. 2d 158.) As noted, the evidence concerning the giving of *Miranda* warnings was contradictory. The police officers involved testified that *Miranda* warnings were given to Schultz prior to both interrogations on March 16, 1976. They stated that warnings were given, even though Schultz was not arrested, because he was the focal point of the investigation at that time. Officer Mooney, who conducted the first interview, testified that he read Schultz his *Miranda* warnings from a form used by the department. He testified that Schultz signed the form and that the signature was witnessed by himself. Another officer on duty that day testified that he observed the signed *Miranda* form at the station on that day and about a week later. Mooney also testified that he had Schultz read his rights back to him from the card. The police were unable to locate the signed *Miranda* form.

■■ ■ Officer Watters, who conducted the second interview on that day, testified that he read Schultz his rights prior to questioning. He testified that he did this as a precaution, even though Mooney had informed him that the required *Miranda* warnings had been given earlier. Watters' testimony was corroborated by Officer Mooney. The police report made out by Watters after the interview did not, however, indicate that *Miranda* warnings had been given. Schultz also testified at the suppression hearing, denying that he was ever advised of his rights. The trial court, after hearing the evidence, concluded that it was the officers who should be believed. Such credibility questions are for the trial court sitting on the suppression motion, and we will not overturn its decision unless it is contrary to the manifest weight of the evidence. In the instant case, we find no basis to reverse the court's denial of the defendant's motion to suppress his statements.

■■ ■ The final issue raised concerning the conviction is whether the defendant was denied his right to counsel when he was asked questions concerning the crime after an indictment had been returned against him. The defense focuses upon questioning of Schultz by the Florida police officer who arrested him in 1979. The officer testified that he went to the Schultz Florida residence to make an arrest, based upon an arrest warrant issued after Schultz' indictment. The officer testified that he read Schultz his rights from a printed *Miranda* card, specifically including his right to have an attorney present with him during questioning and his right to an attorney appointed for him, if he could not afford one. In response to the officer's question, the defendant Schultz indicated that he understood his rights. At that time, the officer asked Schultz if he wished to give a statement. Schultz responded by stating that he could not understand the arrest at the time, because he had been arrested on the charge two years

before and had been released. The defense argues that the questioning was improper because it took place without the presence of counsel, after indictment, and prior to any effective and knowing waiver by Schultz of his right to counsel. The defense cites *People v. Halstrum* (1966), 34 Ill. 2d 20, 213 N.E.2d 498, in support of its argument. *Halstrum* involved a criminal defendant who was incarcerated in a Florida prison. Chicago police asked Florida prison authorities to question the defendant concerning a Chicago burglary for which the defendant had been indicted. A signed confession was obtained by Florida prison authorities. The court there held that the confession was not admissible where the defendant was not represented by counsel and had not knowingly waived his right thereto. (34 Ill. 2d 20, 22.) The critical question in the case at bar, whether the defendant knowingly waived his right to counsel, was not presented in *Halstrum*. The court in *People v. Anthony* (1976), 38 Ill. App. 3d 427, 430-31, 347 N.E.2d 770, discussed this issue and cases thereon:

"In *People v. Smith*, 42 Ill. 2d 479, 248 N.E.2d 68 (1969), the defendant was informed of his right to counsel in a post-arraignment interrogation and offered the opportunity to contact counsel; although, counsel had not been appointed. On appeal from his conviction, defendant challenged the admissibility of the statement made on *Massiah* grounds. The court did not discuss the *Lagardo* and *Milani* interpretation of *Massiah*, but held that by failing to request counsel, defendant had waived the right. The appellate court for the second district relied in part upon *Smith* in holding that defendant had waived the presence of counsel in a post-indictment interrogation where defendant knew of his right to counsel and expressly rejected the presence of counsel and overcame the stated reluctance of the police officer to take his statement. (*People v. Kelley*, 10 Ill. App. 3d 193, 293 N.E.2d 158 (1973).)" (See also *People v. Petty* (1977), 54 Ill. App. 3d 1044, 1049-51, 370 N.E.2d 553.)

While the State has a heavy burden of showing a knowing and intelligent waiver, the question of whether such a waiver has been made is for the trial court to decide, and findings on the issue will not be disturbed on appeal unless found to be contrary to the manifest weight of the evidence. (*People v. Petty* (1977), 54 Ill. App. 3d 1044, 1050, 370 N.E.2d 553.) In the instant case, as noted, the evidence is that the defendant was fully advised of his right to counsel and other rights by the arresting officer. The defendant indicated that he understood his rights. Thereafter the police officer inquired if the defendant had any statement to make, after which the defendant volunteered his statement about being previously charged and released in connection with the crime. There is no evidence of any force or duress, nor any offer of leniency or reward by

the arresting officer. There was not even any specific question asked concerning the crime. Nor is there indication in the evidence that unusual circumstances surrounding the arrest situation prevented the effective exercise of his right to counsel or induced his freely given statement. Similarly, there is no suggestion that at the time he was of below average intelligence, or his intelligence and reasoning were otherwise impaired, so as to prevent him from understanding his right to counsel and from intelligently waiving it. On the contrary, indications in the evidence are that Schultz understood his rights and yet voluntarily chose to make the statement he made. (*People v. Smith* (1969), 42 Ill. 2d 479, 248 N.E.2d 68; *People v. Petty* (1977), 54 Ill. App. 3d 1044, 370 N.E.2d 553; *People v. Anthony* (1976), 38 Ill. App. 3d 427, 347 N.E.2d 770.) Accordingly, we find no error in the trial court's denial of the motion to suppress concerning those statements.

■■ ■ The final issue raised by the defense concerns the sentence imposed upon Glenn Schultz following his conviction. Schultz was sentenced to a term of from 20 to 25 years in prison. The defense notes that defendant Arthur Garza, also convicted for the murder of Bridgette Regli, received a sentence of from 15 to 25 years following his conviction. The third co-indictee, Philip Kline, was given a 50- to 100-year sentence, although that has been reversed and the case remanded to the circuit court for resentencing. The defense herein argues that the sentence imposed upon Glenn Schultz was excessive in light of that imposed upon Arthur Garza for the same crime. As we noted in the *Kline* case, wherein we found the 50- to 100-year sentence for Philip Kline to be excessive, viewed in the context of his sentence as compared with sentences received by Garza and Schultz, it is established that fundamental fairness requires substantially similar treatment in sentencing. (*People v. Martin* (1980), 81 Ill. App. 3d 238, 401 N.E.2d 13; *People v. Johnson* (1978), 59 Ill. App. 3d 640, 375 N.E.2d 1027.) We indicated that, in determining the issue, consideration is to be given to the differences in criminal background and the degree of participation by each defendant in the commission of the offense. Disparate sentences may be supported by either a more serious criminal record or greater participation in the crime or by consideration of danger to the public following release. (*People v. Martin* (1980), 81 Ill. App. 3d 238, 245, 401 N.E.2d 13.) Garza received a 15- to 25-year sentence while Schultz received a 20- to 25-year sentence. Kline's case has been remanded for resentencing, taking into consideration the sentences imposed upon Garza and Schultz. We find that the sentence imposed upon defendant Schultz is substantially similar to that imposed upon his co-indictee Arthur Garza, and that no sufficient disparity exists between the two sentences such that a reversal is required under the authorities above cited. We do not read the cases on this issue to require an exact

duplication of sentencing for defendants similarly situated, but only a substantial similarity. That was obtained in the sentences imposed upon Garza and Schultz, and will be, we assume, with the remandment in *Kline*. We would also note, in passing, that there is support in the record that the fatal blow to the victim was the one, from the rear, striking the victim's head with a tree limb. This was the blow, according to defendant's admissions, which he administered. Thus, we find no basis to reverse the 20- to 25-year sentence imposed upon defendant Glenn Schultz, Jr.

The judgment of the Circuit Court of Will County is affirmed.

Affirmed.

BARRY, J., concurs.

Mr. JUSTICE HEIPLE, specially concurring:

While I concur with the result reached in this case that both the conviction and sentence of Schultz should be affirmed, I cannot endorse the language which republishes, in effect, the gratuitous and meretricious reversal of the sentence in the Kline case. In that regard, I stand on my dissent expressed in *People v. Kline* (1981), 99 Ill. App. 3d 540.